James P. MITCHELL, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

W. I. BOWMAN, Defendant.

Civ. A. 951-N.

United States District Court
M. D. Alabama N. D.

July 2, 1954.

Stuart Rothman, Solicitor, Washington, D. C., Beverley R. Worrell, Regional Atty., and Sanford H. Palmer, Atty., U. S. Department of Labor, Birmingham, Ala., for plaintiff.

Ball & Ball, Montgomery, Ala., for defendant.

KENNAMER, District Judge.

Plaintiff brought this action to enjoin the defendant from violating the provisions of Sections 15(a) (1), 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act of 1938, as amended, 29 U.S. C.A. § 201 et seq., hereinafter referred to as the Act.

The complaint and answer having been filed in this cause and plaintiff and defendant having appeared by counsel and the court having heard this cause and having considered the evidence, the court makes the following findings of fact and conclusions of law.

### Findings of Fact

(1) This action was brought by James P. Mitchell, Secretary of Labor, United States Department of Labor, to enjoin the defendant from violating the minimum wage, overtime, record-keeping and shipping provisions of the Fair Labor Standards Act.

(2) The defendant denies that his employees are subject to the Fair Labor Standards Act and denies that he has violated the minimum wage, overtime, record-keeping and shipping provisions of the Act.

(3) The defendant, W. I. Bowman, resides at Montgomery, Montgomery County, Alabama, within the jurisdiction of this court, and is now, and at all times hereinafter mentioned was, the owner and operator of a place of business located at 412 Furnace Street, Montgomery, Alabama, doing business as Capital Stock Yards, where he is engaged in the production, sale and distribution of livestock.

(4) Defendant's place of business is a livestock auction market located at Montgomery, Alabama, where livestock is brought to defendant's place of business by farmers or other sellers in their own conveyances or transportation arranged by them.

(5) It was established by the testimony of J. G. Broadway, an official of Swift & Company's meat killing and processing plant at Montgomery, Alabama, that a large quantity of cattle is purchased regularly throughout the year by Swift & Company at Capital Stock Yards. During the year of 1953 Swift & Company purchased livestock in the amount of roughly $889,000 at Capital Stock Yards. This livestock was commingled with other livestock purchased by Swift & Company at their packing plant at Montgomery, Alabama, where said livestock is slaughtered, butchered and prepared for further distribution. Substantially over 50 percent of the products produced at Swift & Company's packing plant at Montgomery, Alabama, is shipped to points outside the state of Alabama.

(6) It was established by the testimony of T. L. Holland, cattle buyer for Southern Foods Company at Columbus, Georgia, that all livestock purchased by Southern Foods Company at the Capital Stock Yards is shipped to their meat packing plant at Columbus, Georgia. Mr. Holland further testified that during the period prior to December, 1952, while he attended sales at the Capital Stock Yards as a cattle buyer for South-

ern Foods Company, that from his observation over 50 percent of the livestock handled at the Capital Stock Yards at Montgomery, Alabama, was shipped by the buyers to points outside the state of Alabama.

(7) The defendant produced a list indicating the number of railroad car shipments of livestock received by the Capital Stock Yards at Montgomery, Alabama, from points outside the state and the number of railroad cars of livestock shipped from Capital Stock Yards to points outside the state of Alabama during the period beginning August 1, 1951, to July 31, 1953, as follows:

| Date | No. of inbound railroad cars | No. of outbound railroad cars |
| --- | --- | --- |
| August, 1951 | 1 | 30 |
| Sept., 1951 | – | 30 |
| Oct., 1951 | – | 44 |
| Nov., 1951 | – | 21 |
| Dec., 1951 | – | – |
| Jan., 1952 | – | 6 |
| Feb., 1952 | – | 15 |
| Mar., 1952 | – | 19 |
| April, 1952 | – | 10 |
| May, 1952 | – | 20 |
| June, 1952 | – | 14 |
| July, 1952 | – | 14 |
| August, 1952 | – | 3 |
| Sept., 1952 | – | 2 |
| Oct., 1952 | – | 1 |
| Nov., 1952 | – | – |
| Dec., 1952 | – | – |
| Jan., 1953 | – | – |
| Feb., 1953 | – | 2 |
| March, 1953 | – | 3 |
| April, 1953 | – | 2 |
| May, 1953 | – | 1 |
| June, 1953 | – | 2 |
| July, 1953 | – | – |

(8) It was established by the testimony of Jack Thrasher, the owner and operator of a local trucking company whose place of business is located across the road from the Capital Stock Yards, that 10 percent of the cattle transported away from the Capital Stock Yards by Mr. Thrasher's trucks was transported to points outside the state of Alabama.

(9) An exhibit was introduced into evidence which was prepared by Jack Whittaker, office manager of the defendant, and Edward J. Dunlap, investigator of the Wage and Hour and Public Contracts Divisions, United States Department of Labor, from the defendant's invoices, which showed a sampling of the sales to out-of-state buyers of cattle from Capital Stock Yards during a period beginning August 9, 1951, through June 8, 1954, and disclosed that a substantial amount of cattle was purchased each week at the Capital Stock Yards during the entire period by out-of-state buyers from Georgia, Mississippi, Florida, Tennessee, Illinois, Indiana, Kentucky, Maryland and North Carolina.

(10) Defendant's employees receive, weigh, tag and pen incoming livestock. The defendant's employees, as the needs are required, feed, water and tend the livestock. Auction sales of cattle and livestock other than horses and mules are held on Tuesday and Friday of each week and during certain periods of the year sales are conducted on Mondays. During the sales defendant's employees release from the pens, lead, drive, ride or otherwise attend to livestock in the sales ring and after it has been sold, return such livestock to the appropriate pen where it is checked off and subsequently loaded onto trucks of the buyer or railroad cars or held for subsequent delivery on the buyer's order.

(11) During the week other than on sale days the defendant's employees clean up the premises after the sales or make ready for sales, disinfect the pens, haul manure, sometimes feed and water livestock, repair the premises of the stock yards and in general perform all duties necessary to the operation of defendant's business. Office employees keep books and records pertaining to defendant's business transactions including the issuing of checks and preparing bank drafts.

(12) Two of defendant's employees, Chester Johnson and James Tolliver, worked a night shift beginning at 6 p. m. to 6 a. m., 12 hours a night, 6 days a

week, making a total of 72 hours per week. No record was kept by the defendant of the hours worked by these employees. These employees were engaged in receiving, feeding, watering, caring for and otherwise handling livestock at the Capital Stock Yards. Chester Johnson received a weekly salary of $33.75 and James Tolliver received a salary of $30.00 per week. The regular rate of pay for both of these employees was less than 75 cents per hour and neither of these employees was compensated at the rate of time and one-half his regular rate of pay for those hours worked in excess of 40 during a workweek.

(13) James Smith worked at the defendant's stock yards during the auction sales on Tuesday of each week of his employment and on Fridays whenever it was necessary in the sorting, penning, caring for and otherwise handling livestock. The remainder of his work was done upon the defendant's farms repairing fences, tending to cattle and doing other farm work which might be necessary. James Smith was compensated at the rate of 75 cents per hour for all hours worked for the defendant. However, upon occasions when he worked in excess of 40 hours during a workweek he was not compensated at the rate of time and one-half his regular rate of pay for those hours worked in excess of 40 during the workweek.

(14) James Penn worked at the Capital Stock Yards throughout the week as a feed man feeding, watering, caring for and otherwise handling livestock. Frequently he worked in excess of 40 hours per workweek as reflected by the defendant's payroll records. He received 75 cents per hour for each hour worked. However, he did not receive time and one-half his regular rate of pay for those hours worked in excess of 40 during a workweek.

(15) K. B. Broadway worked for the defendant at the Capital Stock Yards as a yard superintendent during 1953 and at the time of the trial he was compensated on a salary basis of $51.92 per week. Mr. Broadway engaged in receiving, caring for and otherwise handling livestock at the Capital Stock Yards on Mondays, Tuesdays, Wednesdays, Fridays and some times on Saturdays. On Thursday of each week he worked for the defendant at the Demopolis Stock Yards at Demopolis, Alabama, where he engaged in conducting auction sales for the defendant. The Demopolis Stock Yards is operated by the defendant, W. I. Bowman, and another part on a partnership basis. Upon occasions K. B. Broadway would work in excess of 40 hours during a workweek, including his work at the Demopolis Stock Yards. No record has been maintained of the hours he worked and his salary of $51.92 includes all work performed for W. I. Bowman, including the work at the Demopolis Stock Yards.

(16) Thelma G. Pouncey was employed as a bookkeeper at defendant's establishment. She prepared and kept books for the Capital Stock Yards. During 1953 and up to the time of the trial she received a salary of $69.23 per week. No record is kept of the hours she worked. Upon occasions she would work in excess of 40 hours during a workweek and she did not receive time and one-half her regular rate of pay for those hours worked in excess of 40 during a workweek.

(17) The defendant, W. I. Bowman, testified that he had not paid any employees time and one-half their regular rate of pay for those hours worked in excess of 40 in a workweek.

## Conclusions of Law

(1) The court has jurisdiction of the parties hereto and of the subject matter of this action.

(2) The defendant's employees engaged at the livestock auction market in receiving, feeding, watering, caring for, selling and delivering or otherwise handling livestock for subsequent out-of-state transportation are engaged in interstate commerce within the meaning of the Act. Walling v. Friend, 8 Cir., 156 F.2d 429; Mitchell v. Valdosta Livestock Co., D.C.,M.D.Ga., October 26, 1953, Judge Davis, 24 Labor Cases, par. 67,

917, 11 W.H.Cases 674; Fleming v. Kenton Loose Leaf Tobacco Warehouse Co., D.C., 41 F.Supp. 255; Walling v. Home Loose Leaf Tobacco Warehouse Co., D.C., 51 F.Supp. 914; Walling v. Lincoln Looseleaf [Tobacco] Warehouse Co., D.C., 59 F.Supp. 601.

(3) Defendant's employees engaged in penning, weighing, tagging, feeding, watering or otherwise handling livestock which is subsequently transported or delivered to buyers for transportation in interstate commerce or in making and keeping records of such transactions are engaged in the production of goods for interstate commerce within the meaning of Section 3(j) of the Act. Walling v. Friend, supra.

(4) The defendant has violated, and is violating, the provisions of Section 6 and 15(a) (2) of the Act by employing his employees mentioned in Conclusions of Law No. (2) and No. (3) above in interstate commerce and in the production of goods for interstate commerce at wages less than 75 cents per hour.

(5) The defendant has violated, and is violating, the provisions of Sections 7 and 15(a) (2) of the Act by employing his employees mentioned in Conclusions of Law No. (2) and No. (3) above in interstate commerce and in the production of goods for interstate commerce for more than 40 hours in a workweek without compensating them for such excess hours at a rate of pay not less than one and one-half times their regular rate of pay.

(6) The defendant has violated, and is violating, the provisions of Section 15(a) (1) of the Act by transporting, offering for transportation, delivering or selling in interstate commerce or delivering for shipment or transportation with knowledge that shipment, delivery, transportation or sale thereof in interstate commerce was intended, goods, namely livestock, in the production of which his employees were employed in violation of Sections 6 and 7 of the Act.

(7) The defendant has violated, and is violating, the provisions of Section 15(a) (5) of the Act in that the records kept by him fail to show adequately and accurately, among other things, the hours worked each workday and each workweek by each of his employees together with their regular rate of pay and excess overtime pay, as required by Title 29, Chapter V, Code of Federal Regulations, Part 516.

(8) The defendant's employees who work two or three days at the stock yards on sale days and the rest of the week on the farms of the defendant are subject to Sections 6 and 7 of the Act during the entire week and with regard to all hours worked for the defendant. Waialua Agricultural Co., Ltd. v. Maneja, D.C., 97 F.Supp. 198; Walling v. Black Diamond Coal Mining Co., D.C. W.D.Ky.1943, 59 F.Supp. 348.

(9) The defendant's employee who works one day a week for the defendant and another party at the Demopolis Stock Yards, Demopolis, Alabama, and the remainder of the week at the Capital Stock Yards at Montgomery, Alabama, is jointly employed by the defendant and during the entire week is entitled to the overtime compensation for all hours worked in excess of 40 per workweek for the defendant.

Sufficient cause therefor appearing, a permanent injunction should issue granting plaintiff the relief sought in the complaint.

Let judgment be entered accordingly.