**M. P. SAMS, Appellant,**

v.

**E. M. BECKWORTH and Archie Beaty, Individually and d/b/a Hi-Way Auto Wrecking & Supply Co., Appellees.**

No. 17192.

United States Court of Appeals
Fifth Circuit.

Dec. 2, 1958.

Rehearing Denied Dec. 17, 1958.

Bill B. Lambert, Tyler, Tex., for appellant.

Truman Warren, Alex P. Pope, Tyler, Tex., for appellees.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This is another case involving Fair Labor Standards Act, 29 U.S.C.A. §§ 201–219, coverage of employees of wrecked auto parts companies, and is in many respects similar to Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883. It differs from Jaffe primarily in that the sole Employee before the Court in this case is a watchman, M. P. Sams. We are not presently concerned with coverage of employees actually engaged in stripping salable parts from the wrecked bodies, or otherwise handling the scrap that

eventually finds its way into interstate commerce.

Although the facts are more adequately elaborated in the opinion below of Judge Sheehy, Sams v. Beckworth, E.D. Tex., 1958, 168 F.Supp. 686, they will be abbreviated here for convenience in arriving at our decision. The Employer[1] was engaged in the business of buying wrecked auto bodies from used car dealers, motor dealers, and insurance companies, and selling the usable, valuable parts which could be stripped from them to all who would buy. As Mr. Beaty so colorfully and candidly put it, "we just had like * * * a produce stand, just sold what we could to who we could and what we could get for it." Some of the bodies were stored on an eight-acre tract outside of Tyler where the Employee, Sams, worked. The District Court found that they sold parts entirely intrastate to garages, used car dealers, and individuals, in an amount averaging $8,000 in gross sales every month.

A by-product of such a business—far more substantial in bulk than in revenue —is the scrap remaining after the salable parts have been removed from the wrecked bodies. The District Court found, as is apparently so often true in these wrecked auto parts cases, that a substantial part of this scrap found its way into the interstate product of steel foundries.[2]

There was certainly nothing about the circumstances of this employment to suggest that either Employer or Employee had the slightest notion that it was of a kind related to interstate commerce so as to impose a minimum wage under a Federal statute. Sams was employed as a night watchman by Employer in August 1955. He was the father-in-law of the Employer's Parts Manager, his wife was in a mental hospital, and he had recently lost another watchman's job that paid $18 a week[3] with "everything furnished." This man, to whom "everything furnished" had meant "a garden, truck patch and some groceries," was offered $25 a week and a place to live. To him this became his home as well as his place of work. He was given a "little yellow school bus" on the storage yard. Although he first had to find wood to heat and cook with, he was later given an old, operating gas stove, a bathroom heater, and the bus was wired for one electric light. From the beginning the Employer brought Sams' water supply though this was apparently the matter around which centered the dissatisfaction that caused him to leave in January 1957. He grew onions and six rows of Irish potatoes in his garden behind the bus, and raised "seventy-five head" of chickens.

In exchange for this salary and fringe benefits, the Employee was obligated to live on the yard but "had no duties to perform other than to watch the premises for thieves and for fire." In fact there is no evidence of any fire during his employment, and Mr. Beaty testified

---

1. The business known as Hi-Way Auto Wrecking & Supply Co. in Tyler, Texas, was operated by Beckworth and Beaty as partners.

2. The District Court stated:
   "The [Employer] paid various sums, up to approximately $400.00, for the wrecked or burned motor vehicles purchased by them. The scrap metal or junk sold by the [Employer] to the scrap metal or junk dealers * * * averaged $4.00 or $5.00 per motor vehicle. During the 17 month period here involved the sales of scrap metal or junk made by the [Employer] aggregated the sum of approximately $3,500 or an average of approximately $210.00 per month."

3. "[Counsel for Employer] Q. Do you remember who you worked for last?
   "[Employee, Sams] A. Mrs. W. C. Wylie.
   *       *       *       *       *
   "Q. What, at the box factory here in town? A. Yes, sir.
   "Q. How much were you paid on that job? A. And I worked—
   "Q. I say, how much were you paid working for Mrs. Wylie? A. I had everything furnished, a garden, truck patch and some groceries and paid eighteen dollars a week and I come and go when I got ready."

that he personally caught the only thief on the yard during this period.

The Employee now asserts that Employer and he are covered by the Act and that he is entitled to $2,930.58 in unpaid wages, based upon working time the District Court found to be "at least" sixty hours a week.

■ Adopting now the analysis of Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883, the District Court was wrong in holding that the Employer, as such, was not engaged in the production of goods for interstate commerce so that the Employee "while employed * * * was not engaged in the production of goods for commerce." The Employer here seems clearly to be engaged in the production of "goods" for commerce (or at least a "part or ingredient thereof") within the terms of section 3(i) of the Act, 29 U.S.C.A. § 203(i), when it sells scrap iron that eventually finds its way into the interstate product of this nation's steel producers. That this is a small percentage of Employer's business ($210 of $8,000 a month sales, see note 2, supra) is of little moment. See, e.g., Tilbury v. Mitchell, 5 Cir., 1955, 220 F.2d 757, affirming sub nom. Tilbury v. Rogers, D.C.W.D.La.1954, 123 F.Supp. 109, certiorari denied, 1955, 350 U.S. 839, 76 S.Ct. 77, 100 L.Ed. 748 (0.216 of 1% of total dollar volume).

■■ But this is not enough. Whatever Employee's duties may have been, all agree that he was not "producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods." 29 U.S.C.A. § 203(j). Only in showing that he was employed "in any closely related process or occupation directly essential to the production thereof," 29 U.S.C.A. § 203(j), may he find his place under the Act. This he has failed to do.

The District Court expressly found that "[the Employee] was employed as a watchman primarily for the protection of the parts the [Employer was] to sell and incidentally, if at all, for the protection of the scrap metal residue." On the analysis of Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883, this is an altogether reasonable conclusion and certainly could not be said to be "clearly erroneous." Fed.R.Civ.P. 52(a), 28 U.S.C.A.

While we thus affirm the Court's ultimate holding of non-coverage we do not approve the alternative holding under the retail exemption, 29 U.S.C.A. § 213 (a) (2), which we consider was not properly before the District Court for determination.

Affirmed.