James P. MITCHELL, Secretary of Labor, United States Department of Labor

v.

SIN JIN PRODUCTS COMPANY, a corporation, and Fairlawn Tool and Die Company, a corporation.

Civ. A. No. 10570.

United States District Court
D. Maryland.
March 17, 1959.

Stuart Rothman, Washington, D. C., Ernest N. Votaw, Chambersburg, Pa., Howard W. Fineshriber, Philadelphia, Pa., Morton I. Schwartzman, U. S. Dept. of Labor, Washington, D. C., for plaintiff.

Joel Margolis, Baltimore, Md., for defendants.

R. DORSEY WATKINS, District Judge.

This is a suit under the Fair Labor Standards Act (U.S.C.A., Title 29, Section 216(c)) by the Secretary of Labor to recover on behalf of one employee (Gordon W. Gifford) wages at the rate of time and one half for employment in excess of 40 hours for each week from the work week ending May 2, 1956 through the work week ending February 6, 1957, in the amount of $756.26.[1] The filing of a written request by Gifford for the bringing of the suit is admitted.

In substance, plaintiff contends that Gifford was employed jointly by the defendants, Sin Jin Products Company (Sin Jin) and Fairlawn Tool and Die Company (Fairlawn). The evidence shows, without contest or contradiction, that each of the defendants was, at all relevant times, engaged in interstate commerce; and that Gifford, during the times in question, worked for both companies in excess of a total of 40 hours per week. Defendants contend that Gifford was separately employed by the two defendants, and that he never worked more than 40 hours per week for either of said defendants. They also contend that even if Gifford's employment should be found to have been joint, he was employed on an indeterminate work week at $90 regardless of the number of hours worked, and that on such basis the amounts paid him (even although unknowingly and inadvertently) in fact exceeded time and one-half for all weekly overtime.

The questions presented are therefore primarily factual, and will require greater detail than the amount involved may seem to justify.

Sin Jin is engaged in the manufacture and sale of kitchen exhaust fans, sump pumps, metal vents and other miscellaneous items. The stock of Sin Jin is owned two-thirds by Lena R. St. John, and one-third by Teresa St. John and two minor children of Teresa's deceased father. Teresa is President of Sin Jin, Lena is Vice-President and Treasurer, and Joseph V. Barber is Secretary.

Fairlawn operates a machine shop, making tools, dies and jigs. A part of its work, not satisfactorily allocated as to amount, is done for Sin Jin. Its stock

---

1. Suit was filed May 15, 1958. Defendants filed an answer, one defense in which alleged limitations. Plaintiff admits the applicability of the Statute as a partial defense, and has reduced his claim to the principal amount of $729.82.

is owned fifty per cent by Joseph V. Barber, and twenty-five per cent each by Lena R. St. John and Teresa St. John. Barber is President, Teresa is Treasurer, and Lena is Secretary of Fairlawn.

Sin Jin and Fairlawn occupy the premises 5236 Fairlawn Avenue, Baltimore, Maryland. Part of the equipment in the portion nominally occupied by Fairlawn is owned by Sin Jin.

Barber supervised the work of, and hired employees for, both companies. He assigned Gifford to the work he was to do.

Barber had originally worked as a tool and die maker for Edward St. John (husband of Lena and father of Teresa). His ability and work were admittedly superior, and to retain his services, Edward in 1953 entered into a partnership with Barber on a 50-50 basis, to operate a tool and die shop, to be known as the "Fairlawn Tool and Die Co.", "for the making making [sic] of tools, dies and allied machine work". Later the partnership was incorporated as Fairlawn, Barber and Edward each owning fifty per cent of the stock. On Edward's death, his stock interest devolved as above noted. Thereafter Barber became the salaried plant manager for Sin Jin, as well as manager for Fairlawn. He testified, and the court finds that he would not work for Sin Jin except for his interest in Fairlawn.[2]

At first Fairlawn operated only on a part time basis. It advertised for the part time services of a tool and die maker. Gifford applied and was accepted. He became dissatisfied with his other part time work, and asked Barber for full time work with Sin Jin. Barber employed Gifford for Sin Jin at $90 per week for a 40 hour week, with the understanding that Gifford could keep on with Fairlawn on a part time basis. It is the nature and effects of these employments that present the critical issue.

The court finds that Gifford was nominally employed by Sin Jin five days a week from 8:00 a. m. to 4:30 p. m. with a thirty-minute lunch time, not paid, at the weekly salary of $90 (or $2.25 per hour). He had no paid time off, except on two occasions when one-half days were taken for personal reasons, and perhaps in the case of one national holiday. On two occasions he was late, but he made up all missed time, either by early arrival or late departure. He did not (as some employees did) punch a time clock for the 8:00-4:30 work. On many occasions he returned to work after 4:30, in which event he punched a time clock, and was paid for such time at the rate of $2.25 per hour, regardless of the number of total hours worked per day or per week. At the end of the week Gifford was paid by Teresa with two Sin Jin checks; one for $90[3] allegedly for the 8:00-4:30 period, and the other at the rate of $2.25 per hour for the hours worked after 4:30 p. m.

While Gifford was occasionally told (and perhaps could sometimes determine), whether his work related to Sin Jin or Fairlawn, he usually would not know upon what job he was working.[4]

Sin Jin alone kept payroll records. However, by internal arrangements, Fairlawn reimbursed Sin Jin, at $2.25 per hour, for all work, regardless of its nature, done by Gifford after 4:30 p. m. and before 8:00 a. m.[5] However, in the court's opinion, this emphasizes the joint,

---

2. Although not expressly so stated, this would seem necessarily to mean that the activities, and probable success or failure, of Fairlawn and Sin Jin were directly and intimately connected.

3. The record is definite that no deductions were taken from the second pay check. Presumably income and F.I.C.A. taxes were deducted from the 8:00-4:30 check.

4. He explained that after completing a die he would have to prove it out on runs of material. He had no way of knowing if such runs exceeded pure test periods, or whether or not the material so produced was sold, and if so, by which company, although presumably all sales would be on account of Sin Jin.

5. The bookkeeper for Sin Jin and Fairlawn testified that "job tickets" were kept, and used in intercompany accounting, but not in computing payments to employees.

rather than the several, nature of Gifford's employment; for the evidence shows, without contradiction, that Gifford kept on with the job he was doing, whether, ostensibly or in fact, for Sin Jin or Fairlawn, until it was completed. If he started on a Sin Jin job in the 8:00 a. m.–4:30 p. m. period, and did not finish, he would continue until he did, working on this in the period after 4:30 p. m. Likewise, if he began or worked on a Fairlawn job in the period after 4:30 p. m. and did not complete it, he would resume work on it at 8:00 a. m. the next morning. The significance of this is emphasized by the fact that a die job might well continue uninterruptedly over a period of several weeks.[6] Likewise, when working as a machinist, he would continue the particular "run" in day or night shifts until completed.

Add to the foregoing the facts that Sin Jin and Fairlawn had the same offices; physical observation[7] did not disclose which employees were at the time working for which defendant; the office displayed the names of both defendants; the same persons furnished the records for both defendants; the accountant for Sin Jin and Fairlawn was paid by each, by separate check; the court is forced to conclude that Gifford was, within the provisions of the Fair Labor Standards Act (and particularly 29 U.S.C.A. § 203 (a), (d) and (g)) jointly employed by Sin Jin and Fairlawn. While not factually identical, this case falls within the principles of Slover v. Wathen, 4 Cir., 1944, 140 F.2d 258; Mid-Continent Pipe Line Co. v. Hargrave, 10 Cir., 1942, 129 F.2d 655; McComb v. Midwest Rust Proof Co., D.C.Mo.1948, 16 Labor Cases, par. 64, 928; Mitchell v. Bowman, D.

C.Ala.1954, 131 F.Supp. 520; Durkin v. Waldron, D.C.La.1955, 130 F.Supp. 501; Mitchell v. Thompson Materials and Construction Company, Inc., D.C.Calif.1954, 27 Labor Cases, par. 68, 888; see also National Labor Relations Board v. Williams, 4 Cir., 1952, 195 F.2d 669, certiorari denied 1952, 344 U.S. 834, 73 S.Ct. 42, 97 L.Ed. 649; Tobin v. Maryland Beverage Company, Inc. and Southern Packing Company, Inc., D.Md.1953.[8]

Total employment in excess of 40 hours per week during the period in question was established.[9] Defendants contend, however, that Gifford was employed for the fixed weekly wage of $90 with variable or fluctuating hours per week, and under Overnight Motor Transportation Company, Inc. v. Missel, 1942, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682, that in computing overtime, the regular rate of pay is determined by dividing the hours actually worked into $90; that overtime is one-and one-half times such hourly rate; and that on this basis, the $2.25 per hour paid "by"[10] Fairlawn would always exceed such overtime rate.

Defendants frankly recognize the difficulties inherent in such contention.[11] Also (a) the work week to which the $90 related was a 40-hour work week; (b) there was no agreement or intention that the $90 should cover both the Sin Jin and Fairlawn employments; (c) the Fairlawn rate of $2.25 was for work after 4:30 p. m., and was not paid as, or intended to be, overtime or premium pay.

Let judgment be entered for plaintiff against defendants in the principal amount of $729.82, with interest in the amount of $102.17, or a total of $831.99, and costs.

---

6. Barber admitted that Gifford could work for Fairlawn "during Sin Jin hours."

7. By the investigator for the Wages and Hours Division.

8. Civil No. 5703; oral opinion by Coleman, C. J. not reported.

9. In only one week were the total hours not in excess of 40; in one week they were 44; in the others, they ran from 48 to 71.

10. Even on defendants' theory, these payments were "on account of", rather than "by", Fairlawn.

11. They admit that payments to Gifford were not made on this theory or basis, and that defendants "were in fact nothing more than lucky that they inadvertently paid enough so that they were not violating the law."