**James P. MITCHELL, Secretary of Labor, United States Department of Labor, Appellant,**

v.

**HOOPER EQUIPMENT COMPANY, Inc. et al., Appellees.**

**No. 17908.**

United States Court of Appeals Fifth Circuit.

June 24, 1960.

Rehearing Denied Sept. 29, 1960.

Bessie Margolin, Asst. Sol., Beate Bloch, Atty., Harold C. Nystrom, Acting Sol., U. S. Dept. of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., Birmingham, Ala., for appellant.

Robert M. Brake, Benjamin W. Turner, Turner, Hendrick, Fascell & Brake, Coral Gables, Fla., for appellees.

Before HUTCHESON, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question here is whether persons engaged in mining rock from quarries belonging to a company which then processes the rock into aggregate or premixed cement for delivery in substantial quantities to contractors engaged in construction of major facilities of interstate commerce are covered under the Fair Labor Standards Act? 29 U.S.C.A. § 201 et seq. The District Court held that such activities were too remote, that is, not a closely related process or occupation directly essential to the production of goods for commerce. We disagree and reverse.

To demonstrate just what is and just what is not included, we find assistance in an adaptation of the technique of the flashback now so common in dramatic presentations. We start with the end-product and then refer back to the processes of its origin. In doing so, we, as do all parties, adopt the findings of fact made by the District Court which we either repeat verbatim or occasionally paraphrase.

Maule Industries, Inc. is a large integrated construction materials concern located in Florida. For the 2½ years involved here (1956–1958), its cumulative sales volume approximated $50,000,000. Among its products sold to contractors

are aggregate, coarse and fine, ready-mix cement, concrete blocks, and the like. It serves over 10,000 customers a year and makes about 2,000 deliveries each day. In the period involved, Maule sold substantial quantities of aggregate and concrete to construction contractors who use such materials directly in the repair, extension, maintenance and improvement of airports, docks, public highways, streets, roads and railroads which the District Court judicially noticed to be instrumentalities used extensively in transportation of goods and persons to and from points outside of the State of Florida.[1]

These sales for direct use in interstate facilities were substantial in point of time, frequency, amount and value. Sales of aggregate and concrete produced from Maule's stone quarries for use on such interstate instrumentalities amounted to not less than 7% and not more than 10% of Maule's total sales. In dollars this would run from $3,500,-000 to $5,000,000. All of the coarse aggregate, much of the fine aggregate, and all of the concrete contained aggregate produced from Maule's quarries. The percentage of this varied with the test quality-standard. Taking this into account, the percentage of quarry products in the 7%–10% sales for interstate facilities was such that it amounted probably to 2% of Maule's sales and 5% of its bulk deliveries. Such interstate-destined sales, therefore, ran in the neighborhood of $1,000,000.

This aggregate is crushed oolite, a form of limestone. All of it comes from quarries on land owned by Maule, located, except in one instance, in the immediate vicinity of Maule's processing plants. Maule's direct employees first handled the rock when it is dumped into hoppers located on each of the plant sites. Thereafter Maule's employees perform all of the operations. The rock is passed over a scalping screen or a wobbler feeder that removes the sand and small particles of rock with the larger rock remaining then going into the primary crusher. Following this the rock is passed over a sizing screen and washing screen and the oversize rock from that goes through a finishing crusher. When the crushing process is completed, the materials produced are rock, commonly referred to as coarse aggregate, and sand, referred to as fine aggregate. All of the concrete, including both ready-mix and batch-mix, sold by Maule has contained coarse aggregate produced from its stone quarries. All of the coarse aggregate sold by Maule in this period has been derived from stone mined on its quarries.

All employees of Maule having anything to do directly with this handling and processing of the rock, and the resulting aggregate and concrete, sold and delivered for use in interstate facilities would, without a doubt, be covered under the Act as persons engaged in the production of goods for commerce. This was the principle articulated in Alstate Construction Co. v. Durkin, 1953, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745, which found precise application in the companion case of Thomas v. Hempt Bros.,[2]

1. Some substantial, specific, tangible projects were described by the Court: "Included among those instrumentalities are the Miami International Airport, U.S. Highway No. 1, U.S. Highway No. 441, Port Everglades, the Seaboard Air Line Railroad, the Florida East Coast Railway, and numerous other instrumentalities of interstate transportation."

2. Reversing the Supreme Court of Pennsylvania, the Court held sufficient the "complaint [which] alleged these facts: Hempt Brothers operate a stone quarry in Pennsylvania, use the stone in manufacturing cement mixtures, and then haul these mixtures in trucks to customers. Their customers were the Pennsylvania Turnpike, the Pennsylvania Railroad Company, an airport, an army depot, and a navy depot, all located within the state of Pennsylvania. The concrete was processed for use by these customers on Pennsylvania projects [railway roadbeds, interstate highway, air fields]. * * * Thomas was employed in producing and handling the quarry and concrete products." 345 U.S. at pages 19, 20, 73 S.Ct. at page 569, 97 L.Ed. at page 753.

1953, 345 U.S. 19, 73 S.Ct. 568, 97 L.Ed. 751. Pointing out that persons working on highways, railroad rights-of-way, airfields, or other facilities of interstate commerce are engaged "in commerce," the Court reached the same conclusion for those who produce the materials directly needed. "By the same token he who produces goods for these indispensable and inseparable parts of commerce produces goods for commerce. We therefore conclude that Alstate's off-the-road employees were covered by the Act because engaged in 'production of goods for commerce.' " Alstate Construction Co. v. Durkin, supra, 345 U.S. at page 16, 73 S.Ct. at page 567, 97 L.Ed. at page 749. We have followed this on a number of occasions. One is Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186. The only difference is that here we are dealing with quarrying and processing of rock for use on interstate facilities while there we were concerned with timber logs for use by the Georgia Highway Department. See also Archer v. Brown & Root, Inc., 5 Cir., 1957, 241 F.2d 663.

Now the scene shifts. This comes about because Maule does not use its own direct employees to mine the rock or bring it to the hoppers at its plant sites where the process described above takes place. Instead of Maule doing this work, it made a contract with the Employer, Hooper Construction Company (or a predecessor affiliate) here involved. This contract called for Hooper to mine and process the rock and then deliver it to Maule's hoppers. The quarries were on land owned by Maule. The rock quarried was Maule's rock. Hooper merely provided the facility, manpower and equipment which Maule would otherwise have had to furnish to exploit its own minerals. Hooper was paid a unit price per ton of rock mined and transported.

This process performed by Hooper's employees to mine Maule's rock on Maule's land for delivery to Maule's nearby plants is a very simple one. Oolite, consisting of lime rock and coral, is mined at places described as quarries by stripping the area to or below the water level so that it is free of overburden, muck, marl and roots. The rock is then drilled and blasted with dynamite Thereafter mechanical earth moving equipment such as draglines dig out the rock from below the water table and place it in windrows. After remaining in the piles for some time for drying, the material is then loaded by dragline into mechanized multi-ton earth-carrying Euclids for transportation to the nearby plants of Maule. By special ramps the Euclids dump the rock into the hoppers to commence the crushing, washing, screening process carried on from that point by Maule's direct employees.

This operation is substantial in time, regularity, quantity and value. It comprises 35 to 40% of Hooper's dollar volume and for this period it involved the mining and delivery to Maule's plants of over 7,000,000 cubic yards of rock for which Hooper was paid $3,726,901.38.

From a physical operational point of view, the process is continuous from the time the mining first commences until the aggregate comes from the crusher, is washed and screened for delivery or use in making concrete. The piling of the rock in windrows even though followed by a delay of a few weeks or months is not an interruption. On the contrary, this is an essential part of the process as well.

What is there, then, to distinguish between the activities of Maule's employees in the second phase—obviously covered under the Act—and comparable activities by Hooper's employees in the first phase of production of rock?

██ Well, clearly several things do not. Of these would first be the intervention of two employers (Maule and Hooper) in a continuous process which might be wholly done by either. Except for questions of knowledge of probable interstate use which we will discuss later, the fact of two entities is not significant. This is because, as many times stated, coverage depends not on the employer's activity since "we focus on the activities of the employees and not on the business of the employer." Mitchell v

Lublin, McGaughy & Associates, 1959, 358 U.S. 207, 211, 79 S.Ct. 260, 264, 3 L.Ed.2d 243, 247. Whether Hooper is regarded as an independent contractor or as some character of agent is irrelevant since "mere separation of the economic processes of production for commerce between different industrial units, even without any degree of common ownership does not destroy the continuity of production for commerce." Schulte v. Gangi, 1946, 328 U.S. 108, 121, 66 S.Ct. 925, 931, 90 L.Ed. 1114, 1122.

█ The relative quantity in terms of output or dollar volume is likewise irrelevant. Actually, the rock mining-transporting operation accounted for 35 to 40% of Hooper's volume and neither that nor the $3,500,000 grossed by it can be called slight. Whether the dollar volume of the rock going into direct use on interstate facilities was $1,000,000 or considerably less matters not since production of the rock was "a regular non-sporadic part of the Employer's general operation of its business" to which must be added "the further crucial" fact that "each of the employees performed substantial activities in connection with it." Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883, 887. Tilbury v. Mitchell, 5 Cir., 1955, 220 F.2d 757, certiorari denied, Tilbury v. Rogers, 350 U.S. 839, 76 S.Ct. 77, 100 L.Ed. 747; Mitchell v. Royal Baking Co., 5 Cir., 1955, 219 F.2d 532; Mitchell v. Hodges Contracting Co., 5 Cir., 1956, 238 F.2d 380, 383.

█ Nor is there anything in the Court's finding to insulate Hooper from knowledge of probable interstate use of substantial quantities of the rock being mined by its employees. Maule's activities as a supplier are well known as its $20,000,000 yearly volume and 2,000

daily deliveries attest. Mr. Hooper, president and guiding light of Hooper Construction Company, was also a director of Maule. Conceding that a director would not know where every batch of concrete or truckload of aggregate went, and that he did not actually know of these deliveries, he could hardly keep from himself knowledge of facts which would have put him on inquiry. Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186, 188. Dealing in terms of thousands of tons of concrete for these interstate facilities, Hooper Construction Company would have learned by inquiry from the very sources in Maule which were relied upon by the District Judge that substantial quantities of the rock which its employees were mining and transporting were going directly into interstate facilities.[3] That is enough. Tobin v. Celery City Printing Co., 5 Cir., 1952, 197 F.2d 228, 229.

Following the format we have chosen this leads then to the climax. So after some suspense we treat Hooper's main contention pressed successfully below that its activities were too remote. That theme is built around the 1949 amendments and the restrictive purpose intended by them. Analysis will demonstrate that this is not relevant to the problem posed here.

█ Under the Act statutory overtime is payable to any employee "who is engaged in commerce or in the production of goods for commerce," § 7, 29 U.S.C.A. § 207(a). As pointed out above, producing materials used directly in interstate facilities is the production of goods for commerce. Alstate Construction Co. v. Durkin, supra; Thomas v. Hempt Bros., supra. That takes us then to the statutory definition of

3. For example, in the construction projects specifically mentioned by the District Court, see note 1, supra, the record shows without dispute the following quantities of materials delivered by Maule all of which contained substantial proportions of Maule quarry rock mixed by Hooper: Miami Airport, between 32,000 and 50,000 tons aggregate for 63,000 cubic yards concrete plus approximately 5,000 tons ready-mix concrete; MacArthur causeway, 14,000 cubic yards ready-mix concrete; Port facilities at Port Everglades, 4,500 cubic yards ready-mix concrete.

"goods."[4] Now here the "goods" being produced for commerce comprise cement and aggregate. Under the definition the "goods" comprehends both the finished or delivered product (cement or screened aggregate) and more important "any part or ingredient thereof." Since the production contemplated in the statute concerns such "goods" or any ingredient thereof, those employees who produced the aggregate which goes into the cement delivered for interstate facilities are automatically engaged in the production of goods for commerce. It simplifies the problem greatly to set out again the statutory definition of "produced" in a way graphically to portray those activities which are [1] "engaged *in* the production" of goods and [2] those related to but which are not *in* the production itself.[5] The Act provides:

" * * * for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed [1] in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or [2] in any closely related process or occupation directly essential to the production thereof * * *." 29 U.S.C.A. § 203(j).

Here every activity of Hooper's employees comes literally within factor [1] of the statutory definition. Every employee involved was engaged in "mining" the rock, in the "handling" and the "transporting" of it in the quarries into the windrows and from the quarry to Maule's hopper. And those specific occupational definitions do not cover every employee in the quarrying process, then they certainly are covered in the final clause of [1] as persons "working on such goods" in any other manner.

■ From the standpoint of persons actually performing activities of an oper-ational character Congress undertook to make no changes in the statutory definition. It was not concerned with those who actually work on and manufacture a product or who, in a physical sense, produce the goods constituting "commerce" or to be used in facilities of commerce. What it was concerned with was employment in accessorial services removed in a physical operational sense from the manufacturing process, but which, in a practical business point of view, were important to the production process. This group would include persons such as stenographers, billing clerks, shipping clerks, engineering draftsmen, watchmen, and the like. It was as to these that Congress was disturbed both with administrative interpretation and with some court decisions. The problem arose out of factor [2] and it was that portion of § 3(j) alone which was amended.

We recognized and applied this distinction in Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883, 887. Distinguishing the watchmen whose status was determinable under factor [2] from the other junk yard employees who actually worked on the wrecked automobiles subsequently moving to local steel mills as an ingredient of steel manufactured for interstate shipment, we had this to say. "Everything done was with respect to the very 'goods'. They were producing goods for commerce. There was no need to look at collateral activities not immediately associated with the goods to determine their relevance * * *." 261 F. 2d at page 887. See also Sams v. Beckworth, 5 Cir., 1958, 261 F.2d 889.

That this was a proper interpretation of the legislative history is borne out by the full discussion of this amendment in Mitchell v. H. B. Zachery Co., 1960, 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753. The Court seems to analyze the statutory scheme in the three gradations of (a) in

**4.** § 3. "As used in the Act— * * * "(i) 'Goods' means goods * * * products, commodities * * * or articles * * * of commerce of any character, or any part or ingredient thereof, * * * ." 29 U.S.C.A. § 203(i).

**5.** The term is first broadly defined: "(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on * * * ." § 3(j), 29 U.S.C.A. § 203(j).

commerce, (b) production of goods for commerce, and (c) work closely related to production for commerce. "A step removed from employment 'in commerce' is employment 'in' production which is 'for' commerce. Under this clause we have sustained coverage whether the product is to be consumed primarily by commerce in the statutory sense, by its 'facilities and instrumentalities,' see Alstate Const. Co. v. Durkin * * *. Furthest removed from 'commerce' is employment not 'in' production 'for' commerce but in an activity which is only 'related' to such production. In applying this provision, we have necessarily borne in mind that it is furthest removed in the scheme of the statute from the hub of the national interest in 'commerce' * * *. The amendment of § 3(j) in 1949 did not alter the basic statutory scheme of coverage, but did reinforce the requirement that in applying the last clause of the section its position at the periphery of coverage be taken into account as a relevant factor in the determination." Mitchell v. H. B. Zachary, supra, 80 S.Ct. at page 743, 4 L.Ed. 2d at pages 759–760.

■ We flash back again to the opening scene. Maule takes rock from quarries owned by it and processes the rock into aggregate which forms an essential ingredient of cement delivered in substantial quantities to contractors engaged in working on major facilities of interstate commerce. The process is a continuous industrial one from the time the first dragline takes its bite until the cement is poured. Maule knows of the substantial percentage of such interstate facilities sales, and all of its employees so engaged, or who would be engaged are obviously under the Act. Nothing distinguishes the employees of Hooper performing like work on the same goods

(which includes all ingredients) save their employment by a different company. That is insufficient either to change the status of employees as interstate workers, or knowledge by their employer of the interstate destiny of some of the goods (or the ingredients of them). The Secretary's complaint was therefore well founded and appropriate relief ought to have been granted, and to secure such the cause is reversed and remanded [6] for further consistent proceedings.

Reversed and remanded.

---

6. We make no intimation on the need for the issuance or scope of any injunctive orders. See Mitchell v. Hodges Contracting Co., 5 Cir., 1956, 238 F.2d 380, 381; Mitchell v. Hausman, 5 Cir., 1958, 261 F. 2d 778, 780; Mitchell v. Blanchard, 5 Cir., 1959, 272 F.2d 574, 576–577. And on this record we are unable adequately to determine whether there is any reasonable basis or need for an injunction against Hooper Equipment Co., Inc., apparently dissolved, or Fred W. Hooper in his individual capacity.