292 F.2d 105
 James P. MITCHELL, Secretary of Labor, United States Department of Labor (Arthur J. Goldberg, Secretary of Labor, substituted as party appellant in place and stead of James P. Mitchell, resigned), Appellant,
v.
JOHN R. COWLEY & BRO., INC., and Marine Junk Company, Inc., Appellees.
 No. 18440.
 United States Court of Appeals Fifth Circuit.
 June 23, 1961.
 
 Jacob I. Karro, Atty., Dept. of Labor, Bessie Margolin, Asst. Solicitor Dept. of Labor, Harold C. Nystrom, Acting Solicitor of Labor, Washington, D. C., Lawrence P. Hochberg, Atty., U. S. Dept. of Labor, Dallas, Tex., Beverley R. Worrell, Regional Atty., Birmingham, Ala., for appellant.
 Alvin McConnell, Arthur J. Kearley, Kearley & McConnell, Mobile, Ala., for appellees.
 Before RIVES, JONES and BROWN, Circuit Judges.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 This appeal by the Secretary from an adverse judgment in favor of the Employers in a § 16(c), 29 U.S.C.A. § 216(c), suit on behalf of a worker concerns two issues: was the worker an employee rather than an independent contractor? If an employee, was his work as a watchman in a "* * * closely related process or occupation directly essential to the production * * *" of goods for commerce? The Secretary by motions for directed verdict and peremptory instructions challenges the sufficiency of the evidence to sustain the adverse answers to these questions implied by the general verdict in behalf of the Employers.
 
 
 2
 The work involved is that of a watchman (nighttime and during week-end closing periods) in two adjacent but separate junk yards in Mobile, Alabama separately owned and operated by Cowley[1] and Marine.[2] A city street, Madison, running east-west separates the two yards. Cowley occupies the whole block to the north. Marine occupies almost all of the block to the south. The yards are fenced and have entrance gates which are locked during closing hours. Each company is engaged in the purchase, receipt, handling, warehousing, storing, sale and distribution of scrap, hides, paper and other materials as well as scrap metals including aluminum, copper, brass, nickel, ferrous and non-ferrous materials. In addition, Cowley purchases, receives, prepares, stores and warehouses at these premises mink and other valuable furs as a part of an extensive trade carried on with furriers in the New York area.
 
 
 3
 Undisputed evidence affording specific illustration of activities of each fully confirmed the trial stipulations that each was "* * * engaged * * * in the production, sale and distribution of scrap metal, rags, paper, hides and other junk, substantial quantities of which were regularly shipped, delivered, transported, offered for transportation and sold in commerce, as defined by the Act, and shipped, delivered or sold with knowledge that shipment, delivery or sale thereof in commerce was intended from the defendant's said place of business to points outside the State of Alabama." Thus, in one fell swoop, the sometime troublesome questions of interstate destination, Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883, and the employer's knowledge of it, Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186, were irrevocably answered in favor of basic coverage. There is likewise no dispute that if the activity were within the Act, the hours worked and compensation paid did not meet the statutory standards for minimum wages or overtime.[3]
 
 
 4
 The Companies' main defense, successfully asserted below, is that Allen, the worker, was an independent contractor, not an employee. No doubt the formal written contract called him that, but that is only the beginning of the problem, not the answer to it.[4] Mitchell v. Strickland Transportation Co., 5 Cir., 1955, 228 F.2d 124. The arrangement had its genesis with Allen's predecessor MacPherson. Written contracts identical in terms save for the names of the companies were executed by MacPherson although he was never given a copy of either. When MacPherson quit, identical separate contracts were then made with Allen, the only change being the substitution of his name. The contract stated in effect that the named party (MacPherson, Allen) "is engaged in the business of furnishing plant protection and watchmen services in the City of Mobile, Alabama * * *" and is "desirous of contracting with [Cowley, Marine] to furnish plant protection and watching services * *." The contract term was for one year to furnish watchman services "for the protection of the property * * * from fire, theft, vandalism, trespass and other hazards." It expressly recognized that watching service could be afforded to others so that continuous presence of a man was not required on the premises although it was stated that the watching service "shall have a watchman patrol such property for said purposes once each hour * * *" during the time the plant is closed. The watching service had an obligation to furnish "in the performance of this contract sufficient reliable and trustworthy personnel and all necessary equipment * * *" for its employees all of whom should "at all times be under the exclusive management * * * and * * * exclusive control * * *" of the watching service.
 
 
 5
 Quite naturally the companies emphasize the time-worn rubric on right to control the manner and means of work. This was spelled out in the contract and was echoed by management witnesses each of whom denied that anyone had the authority to direct this 72-year-old watchman in the details of the job. But the ultimate indecisiveness of this test — which in an FLSA case is but one of the factors only — is exemplified by translating these words into something meaningful so far as this work is concerned. A watchman watches. A watchman — certainly not a good watchman — would hardly follow a set routine lest his regularity of habit would itself afford to those bent on trespass, pillage or vandalism a safe pattern of operations. So he must deliberately vary his watch if he is to do even a passable job. Then conditions change. The momentary presence of materials of unusual value or susceptibility to loss requires special vigilance. Rendering special vigilance, it is true, relates to a manner or means of an operational detail. But it is the very same sort of judgment that the job inevitably calls for whether it is done by one who is considered an "employee" or "an independent contractor."
 
 
 6
 This illustrates the wisdom of the approach followed in the FLSA situations which accords unusual significance to the highly specialized nature of the work to be done as a factor in determining whether one called a contractor is really not an employee. If a specific individual regularly performs tasks essentially of a routine nature and that work is a phase of the normal operations of that particular business, the Act will ordinarily regard him as an employee. Mitchell v. Strickland Transportation Co., 5 Cir., 1955, 228 F.2d 124, at page 127; Fahs v. Tree-Gold Co-op. Growers of Florida, 5 Cir., 1948, 166 F.2d 40, at page 44; Rutherford Food Corp. v. McComb, 1947, 331 U.S. 722, at page 729, 67 S.Ct. 1473, at page 1476, 91 L.Ed. 1772.
 
 
 7
 And this is so even though precisely the same service could be furnished by a contractor through the activities of its personnel. This brings into play another factor of substantial significance: whether the so-called contractor is really engaging in the business as distinguished from performing personal labor. There may be, as we have held, a genuine watchman service. Bowman v. Pace Co., 5 Cir., 1941, 119 F.2d 858. When such is the case the worker performing the task is the employee of the contractor, not an employee of the concern hiring the contractor. That contractor, as the employer in relation to its own employees, may itself become subject to the Act principally because of the nature of the activities of the primary business with whom it has made the contract. Walling v. Sondock, 5 Cir., 1942, 132 F.2d 77, certiorari denied 1943, 318 U.S. 772, 63 S.Ct. 769, 87 L.Ed. 1142; Durkin v. Joyce Agency, Inc., D.C.N.D.Ill.1953, 110 F. Supp. 918, affirmed sub nom. Mitchell v. Joyce Agency, Inc., 1955, 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740.
 
 
 8
 The solution is, of course, to be found in terms of "the `economic reality' rather than `technical concepts' [as] the test of employment." Goldberg v. Whitaker House Cooperative, 1961, 81 S.Ct. 933, 936. When done here this record does not supply any of the indicia of a genuinely maintained and operated watchman enterprise followed by the worker Allen as a business as distinguished from personal employment.[5] To begin with his work as a watchman under the contract, though done mostly at nighttime, was precisely the same activity which he previously performed as an employee for one of these companies. For a year and a half prior to July 1955 (which was during the time of the MacPherson contract) Allen worked for Marine as a watchman on Saturdays and Sundays. He was paid 75¢ an hour as a direct employee. Oddly enough there was an unusual sequel to this which demonstrates as well that there is no substantial difference between the operations of Cowley and Marine. For subsequent to the period included in this suit, Allen worked Saturdays and Sundays for Cowley as a direct employee at $1.00 per hour from December 19, 1956 to March 7, 1957.[6] Both before and after the contract term, Allen's actual work as an acknowledged employee was the same as that done by him as a contractor. The only difference was the rate and method of compensation and, of course, the title.
 
 
 9
 It is just as obvious that despite the expressly worded reservation in the contract that Allen was free to furnish such watchman services to others, there was neither any expectation that he would or could do so in sufficient volume to permit earnings that would enable the contractor to comply with the Act. The contracts with Cowley and Marine were executed the same day with each company aware of the other's action. The contracts called for an hourly patrol. On this the evidence showed that it took approximately 20 minutes to make the rounds of each yard. That left but 20 minutes at the most. The record is silent as to any other neighboring industrial facilities which Allen could have serviced personally within this limited time. And for him to service industrial companies probably subject to the Act through additional watchmen personnel, he would have had to have three to four contracts at the specified rate of $25 per week in order to comply with the Act.[7] In the nearly three years of the operation of the MacPherson-Allen contract, there was no evidence whatsoever to warrant an inference that these two companies seriously could have thought that this 72-year-old man with his flashlight, bicycle and gun could or likely would generate this kind of business. On the contrary, they knew that MacPherson had had a solo operation for them alone and that Allen was "contracted" to replace MacPherson when MacPherson got tired of being shot at during some labor troubles.
 
 
 10
 On this record the Court should have instructed the jury peremptorily that Allen was an employee, not an independent contractor as contended. A reversal is therefore required since we cannot know the basis for the general verdict in favor of the defendant companies. But since the scope of the retrial must be determined, we must also examine into the question whether, as an employee, Allen's work as a watchman was in the production of goods for commerce.
 
 
 11
 This matter is not quite so clear as it was respecting the employee status. But in the final analysis we consider on this record that the Trial Court should likewise have given a peremptory instruction in Allen's favor.
 
 
 12
 We have, of course, recognized several times that work as a watchman comes within part [2] of subsection 3(j),[8] so that the inquiry is whether such work is a "closely related process or occupation directly essential to the production" of goods. 29 U.S.C.A. § 203(j). Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883, at page 888; Sams v. Beckworth, 5 Cir., 1958, 261 F.2d 889, at page 891; Mitchell v. Hooper Equipment Co., 5 Cir., 1960, 279 F.2d 893, at page 898. Consequently this brings into operation the 1949 amendment. Of this we commented, "* * * we agree * * * that this 1949 Amendment represented a purposeful effort of Congress to prescribe a standard more restrictive than the former `necessary to the production' test." 261 F.2d 883, at page 886. Thereafter this amendment was extensively discussed in Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed. 2d 753. There, despite perhaps some other uncertainties in the Court's opinion, the Court characterized the 1949 Amendment by stating that it "substantially adopts the gloss of Kirschbaum[9] to indicate the scope of coverage of activities only `related' to production. * *," so that "the approach of Kirschbaum was confirmed * * *." 362 U.S. 310, at page 317, 80 S.Ct. 739, at page 744. This has some unusual relevance since it was upon Kirschbaum that the Court in Walton v. Southern Package Corp., 1944, 320 U.S. 540, 64 S.Ct. 320, 88 L.Ed. 298, held that the watchman, even under the pre-1949 standard, was engaged in the production of goods for commerce. Since that time watchmen have many times been held subject to the Act and nothing in Zachry devitalizes such cases as authoritative guides.[10]
 
 
 13
 Of course coverage depends on the facts as to the individual employee concerned. We put it this way in Jaffe. "To be sure, a watchman may qualify as one whose work is a `* * * closely related process or occupation directly essential to the production' of goods. When courts have found that to be so in fact, or where the facts would admit of no other legal conclusion, watchmen have been held to be covered." 261 F.2d 883, at page 888.
 
 
 14
 We think this record presents a case in which the "facts would admit of no other legal conclusion." This can perhaps best be seen in contrast to the contrary result approved in Mitchell v. Jaffe, supra, and Sams v. Beckworth, supra. In Jaffe, as our opinion reflects, the matter came to us as a sterile question of law on a record which contained only the trial court's findings of fact. As to those persons handling and working on the wrecked automobiles we held on the facts thus found and stated that such persons were covered. All we had as to the watchman was the trial court's findings. Nothing in the Court's other conclusions detracted from the categorical finding that this watchman was "not shown to have been engaged in performing any activities which were closely related or directly essential to the production of goods * * *." Mitchell v. Jaffe, D.C., 156 F.Supp. 596, at page 599; 269 F.2d 883, at page 888. Consequently this was upheld. In Sams the trial judge expressly found that watching was not directly essential. Moreover that record showed that the watchman was hired primarily to protect the usable spare parts which, averaging $8,000 per month, were sold in the intrastate market. Further, after stripping the salvageable parts from the wrecked hulks, there was no real hazard of loss by fire or theft and only an infinitesimal value ($200 per month) was involved, 261 F.2d 889, at page 891.
 
 
 15
 In each of those cases the record (or findings) showed substantial non-interstate interests which, in the employer's judgment, required protection by a watchman. Here the evidence makes no distinction either as to the intra or interstate character of the goods, or the particular things requiring protection. On the contrary, the evidence just lumped it altogether. The watchman was to watch everything. Indeed, the contract refers to the "protection of the property of [the company] located in said block from fire, theft, vandalism, trespass and other hazards." This property included, as the stipulation recited, "substantial quantities" of "scrap metal, rags, paper, hides and other junk" which was "shipped, * * * and sold in commerce." This was, of course, the stock in trade and it was, at least to a substantial degree, an interstate stock in trade. This encompasses all of the individual items constituting the ingredients of the "goods." 29 U.S.C.A. § 203(i). It included as well valuable specialized equipment in the plant for the processing and handling of these materials. The companies had experienced acts of vandalism. There was always a risk of fire. The necessity for a patrol was accentuated because the fences at various places were frequently in bad shape. And in Cowley's case there were valuable furs regularly stored in a building. These were a likely target for loss by fire or theft or both.
 
 
 16
 No effort was made to point out anything particular which Allen was to watch. This means he was to watch it all — the scenery, equipment, and junk. He was to guard the machinery and specialized equipment essential to its processing and handling. Without the stock and machinery on the premises, there would have been nothing to watch. With nothing to watch, there would have been no watchman. He was to protect the subject of interstate commerce — the "goods" and machinery essential thereto — and that is certainly directly essential on these facts.
 
 
 17
 Of course this is always a nice question and frequently one of degree, but if Allen was not there to protect the very goods admitted to be in commerce, then we do not understand why he was there at all. If there is no other explanation — and none is suggested by this record (in contrast to Jaffe and Sams) — then no reasonable mind could have so held, which means that the jury verdict can not stand.
 
 
 18
 The result is that the Court should have peremptorily instructed the jury on both issues. The effect of this would have been to submit to the jury only the question of the hours and times worked, the amount of wages actually received as "contract" payments and the computation of the amounts due under the Act for straight time and overtime. In making these computations, one other factor which we have not yet mentioned will have significant effect. This is the matter of joint employment. At the request of Cowley and Marine the trial court peremptorily instructed the jury that Allen was not jointly employed by the two companies. We think this instruction was erroneous as was the simultaneous refusal to grant a peremptory instruction that Allen was a joint employee.
 
 
 19
 This inquiry does not involve the question whether Cowley and Marine jointly entered into a contract with Allen as a joint employee. It, as the case of employment status, is a question whether for the purposes of the Act he may be deemed to be doing work for both so that the hours worked are aggregated to determine compliance with the requirements concerning hours of work and rates of pay. The significant element is the doing of work for both jointly, not the existence of a joint contract or a legal status of a joint employee. In view of this the actual circumstances of employment again become relevant. Identical contracts, executed initially and terminated finally on the same days, indicate a mutual purpose. And the work to be performed was identical. But of even more significance, the presence of Allen on the premises of either Cowley or Marine was beneficial to both. He was to watch for vandalism, fire, the presence of unauthorized persons, or any other harm that might befall the plant and equipment of either. The properties were contiguous. That meant that while he was on Cowley's lot he was in a position to detect or quickly learn of many of the dangers to Marine's property which he was employed to prevent, and vice versa. Consequently Marine's plant was much safer during such intervals than it would have been had Allen been nowhere in the area. Cf. Walling v. Friend, 8 Cir., 1946, 156 F.2d 429, at page 432. More than that, this contract was not on an hourly basis. It called for watchman service to be continuously supplied during the stated hours. And that contract expressly recognized that he need not be on the premises all of the time. What was required was a patrol once an hour. The result is that during all of this time[11] Allen was literally performing for each. Performing for each simultaneously he was, for the purposes of the Act, performing for them jointly. The hours for one are not to be deducted from the other. Neither are all of the hours for each (91) to be doubled.
 
 
 20
 Under the applicable decisions we think these circumstances compel a finding that Allen was jointly employed. Mid-Continent Pipe Line Co. v. Hargrave, 10 Cir., 1942, 129 F.2d 655, at pages 658-659; Mitchell v. Sin Jin Products Co., D.C.D.Md.1959, 171 F.Supp. 486; Mitchell v. Oregon Frozen Foods Co., D.C.D.Or.1956, 145 F.Supp. 157, at page 163; Durkin v. Waldron, D.C.W.D. La.1955, 130 F.Supp. 501, at pages 506-508; Mitchell v. Bowman, D.C.M.D.Ala. 1954, 131 F.Supp. 520, at page 524; Slover v. Wathen, 4 Cir., 1944, 140 F.2d 258.
 
 
 21
 For the limited trial indicated above, F.R.Civ.P. 42(b), 28 U.S.C.A., and other consistent action the cause is reversed and remanded.
 
 
 22
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 John R. Cowley & Bro., Inc
 
 
 [2]
 Marine Junk Co., Inc
 
 
 [3]
 The period of time involved is from July 5, 1955, to December 12, 1956. Up to March 1, 1956, the statutory minimum was .75¢ per hour, thereafter it was $1.00 per hour
 
 
 [4]
 Each contract specified that the company would "Pay to [Allen] for the services furnished hereunder the sum of * * * ($25.00) Dollars per week, payable bi-weekly."
 
 
 [5]
 Rutherford Food Corp. v. McComb, 1947, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772; United States v. Silk (Harrison v. Greyvan Lines), 1947, 331 U.S. 704, at page 712, 67 S.Ct. 1463, at page 1468, 91 L.Ed. 1757
 
 
 [6]
 This incident must be used with caution. We regard it solely as it shows that the nature of the activities was precisely the same whether Allen was tagged "employee" or "contractor." Formal termination of the Allen independent contract and the subsequent hiring of Allen as an employee is not considered akin to an admission or evidence of it since this was genuinely, but erroneously, thought to be a part of a compromise settlement of this whole matter made by these companies with the Secretary's representatives
 
 
 [7]
 To March 1, 1956, the minimum required for the contract work-week, 91 hours was $68.25; thereafter it was $91
 
 
 [8]
 As to the statutory standard of the production of goods for commerce and the test of § 3(j), we said this in Mitchell v. Jaffe, supra, 261 F.2d 883, at page 886
 "It clarifies it if we separate it into its two major parts:
 "`* * * for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in [1] producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or
 [2] in any closely related process or occupation directly essential to the production thereof * * *.'"
 
 
 [9]
 Kirschbaum v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638
 
 
 [10]
 See Russell Co. v. McComb, 5 Cir., 1951, 187 F.2d 524; Walling v. Sondock, 5 Cir., 1942, 132 F.2d 77, certiorari denied 318 U.S. 772, 63 S.Ct. 769, 87 L. Ed. 1142; Mitchell v. Joyce Agency, Inc., 1955, 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740, affirming Durkin v. Joyce Agency, Inc., D.C.N.D.Ill.1953, 110 F. Supp. 918; Mitchell v. Famous Realty, Inc., 2 Cir., 1954, 211 F.2d 198, certiorari denied 348 U.S. 823, 75 S.Ct. 38, 99 L. Ed. 649
 
 
 [11]
 The contract required watchmen services "from the time the yard * * * is closed each day, until its yard is opened for business the next day * *."