## MITCHELL, SECRETARY OF LABOR, *v.*
## H. B. ZACHRY CO.

No. 83.   Argued February 25, 1960.—Decided April 4, 1960.

*Bessie Margolin* argued the cause for petitioner.   With her on the brief were *Solicitor General Rankin, Harold C. Nystrom, Sylvia S. Ellison* and *Jacob I. Karro.*

*R. Dean Moorhead* and *Chester H. Johnson* argued the cause and filed a brief for respondent.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

Once again we are presented with a nice question concerning the scope of the Fair Labor Standards Act, as amended.   63 Stat. 912, 29 U. S. C. § 207.   The respondent, a construction contractor, was engaged by the Lower Nueces River Water Supply District (hereafter to be called the District) to construct a dam and impounding facilities on the lower Nueces River in Texas at a cost of about $6,000,000, in order to increase roughly tenfold the District's then-existing reservoir capacity.   The dam is not a multi-purpose project; its sole purpose is to

create an expanded reservoir for the District. The water impounded by the District is supplied to consumers locally, within the State of Texas. The site of the new dam was chosen 1,400 feet downstream from the old, with the expectation that upon completion of the new construction the old dam would be inundated and thus replaced by the greatly expanded reservoir. In the interim until completion, the old facilities could serve to assure a continuing water supply.

The District, though for some purposes an independent governmental agency under Texas law, may here be dealt with simply as the water supply system of the included City of Corpus Christi. Its contract with the City requires it to supply the City with the entire water output; and the City in turn agrees to operate and maintain the completed dam and impounding facilities and to supply water to consumers within the District, but outside city limits. It is conceded that between 40% and 50% of all water consumption from the system is accounted for by industrial (as distinguished from residential, commercial, hospital, municipal and other) users, most of whom produce goods for commerce, and that water is essential to their operations. Nor is it contested that an unspecified amount of the water supplied by the District is consumed by facilities and instrumentalities of commerce.

It is agreed that as to the employees here involved—those actually engaged in construction work on the dam—the respondent failed to comply with the requirements of § 7 of the Act, if it is applicable.[1]

On the basis of its applicability the Secretary of Labor sought an injunction in the United States District Court for the Southern District of Texas. That court granted

---

[1] With exceptions not relevant here, § 7, the hours provision, directs an employer to comply with its provisions as to "any of his employees who is engaged in commerce or in the production of goods for commerce . . . ."

the injunction, on two grounds of coverage: (1) since water from the system is supplied to facilities and instrumentalities of commerce, those engaged in building the dam are engaged in the production of goods—water—for commerce; and (2) since the water supplied is essential to industries in Corpus Christi producing goods for commerce, construction of the dam is an occupation "closely related" and "directly essential" to the production of goods for commerce. While the District Court conceded "that Congress intended to narrow the scope of coverage" by the 1949 amendment of the statutory definition of "produced" in § 3 (j), 63 Stat. 911,[2] it concluded that this employment remained within the coverage of the Act.

On appeal the Court of Appeals for the Fifth Circuit reversed. 262 F. 2d 546. It disposed of the first ground of the District Court's decision by holding that the building of a dam could not itself constitute the production of goods for commerce, whatever the use to which the impounded water might be put. In disposing of the second, it invoked a rule that "those engaged in building a plant to be used for the manufacturing of goods do not even come within . . . the . . . statutory definition . . . ." It concluded that under such a rule there could be no coverage of employees engaged in construction of a facility which was not to engage in, but merely to support, the manufacture of goods for commerce. It con-

---

[2] Only the last clause of § 3 (j) was amended in 1949. Before the amendment it was provided that "an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, *or in any process or occupation necessary to the production thereof,* in any State." 52 Stat. 1061. (Emphasis added.) The amended last clause provides: *"or in any closely related process or occupation directly essential to the production thereof,* in any State." 63 Stat. 911. (Emphasis added.)

cluded further that the "remoteness" of these jobs from production justified their exclusion from coverage. Both conclusions reflected its general view that "the amendment of 1949 made even more restrictive the definition of production of goods" than it was under the Act of 1938, when it substituted the words "directly essential" for the word "necessary," and added the requirement that the employment be "closely related" to production.

We brought the case here, 361 U. S. 807, because of an asserted conflict between circuits. (See *Chambers Construction Co.* v. *Mitchell,* 233 F. 2d 717, and *Mitchell* v. *Chambers Construction Co.,* 214 F. 2d 515.)

The court below, in applying its rule excluding "construction," relied on our *per curiam* decision in *Murphey* v. *Reed,* 335 U. S. 865, and distinguished the more detailed decision in *Mitchell* v. *Vollmer & Co.,* 349 U. S. 427, which expressly rejected the "new construction" rule and held construction of a new lock on the Gulf Intracoastal Waterway to be covered employment. It did so by holding that *Vollmer* concerned only coverage under the "in commerce" provision of the Act. The *Vollmer* decision cannot be so confined. It rejected an inflexible "new construction" rule, which had developed in cases under the Federal Employers' Liability Act, see 349 U. S., at 429, 431–432, as inconsistent with the more pragmatic test of coverage under the Fair Labor Standards Act. As early as *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, we recognized that the penetrating and elusive duty which this Act casts upon the courts to define in particular cases the less-than-constitutional reach of its scope, cannot be adequately discharged by talismanic or abstract tests, embodied in tags or formulas. No exclusion of construction work from coverage can be derived from the *per curiam* disposition of *Murphey* v. *Reed, supra.* There, as here, whether construction work is covered depends upon all the circumstances of the relation of the particular activity

to "commerce" in the statutory sense and setting, the question to which we now turn.

By confining the Act to employment "in commerce or in the production of goods for commerce," Congress has impliedly left to the States a domain for regulation. For want of a provision for an administrative determination, by an agency like the National Labor Relations Board, the primary responsibility has been vested in courts to apply, and so to give content to, the guiding yet undefined and imprecise phrases by which Congress has designated the boundaries of that domain.

Before 1949 the boundary of "production" coverage was indicated by the statutory requirement that to be included an activity not "in" production must be "necessary" to it. 52 Stat. 1061. The interaction and interdependence of the processes and functions of the industrial society within which these definitions must be applied, could easily lead courts to find few activities that were discernibly related to production not to be "necessary" to it, in a logical sense of that requirement. The statute, as illuminated by its history, see *Kirschbaum Co.* v. *Walling, supra,* at 522, demanded that such merely logical deduction be eschewed. Courts were to be on the alert "not to absorb by adjudication essentially local activities that Congress did not see fit to take over by legislation." *10 East 40th St. Co.* v. *Callus,* 325 U. S. 578, 582–583.

In *Kirschbaum Co.* v. *Walling, supra,* we added what was deemed a compelled gloss to suggest the limitations of "necessary." We found that the jobs of building-maintenance employees, ranging in responsibility from electrician to porter, of a loft building locally owned but tenanted by production facilities of producers for commerce, had "such a close and immediate tie with the process of production for commerce, and [were] therefore so much an essential part of it," that the employees' occu-

pations were "necessary" to production. In *Borden Co.* v. *Borella,* 325 U. S. 679, precisely the same formulation expressed our conclusion that maintenance employees of a producer-owned office building which was tenanted in part by the producer's central offices, but not by any production facilities, were also within the Act's coverage. In *10 East 40th St. Co.* v. *Callus,* 325 U. S. 578, however, maintenance employees of an office building were held not to be covered. Although the building contained offices of some producers, it was locally owned, held out for general tenancy, and in fact tenanted by a miscellany of tenants. Regardful of the governing principle that coverage turns upon the nature of the employees' duties, and not upon the nature, local or interstate, of the employer's general business, we held the case distinguishable from *Borden* and *Kirschbaum* because the employment, since part of an enterprise which "spontaneously satisfies the common understanding of what is local business," was itself sufficiently different, despite identical employee duties, from prior cases to justify regarding it as separate from the "necessary parts of a commercial process" which are within the Act. These decisions and distinctions were not exercises in lexicography. No niceties in phrasing or formula of words could do service for judgment, could dispense with painstaking appraisal of all the variant elements in the different situations presented by successive cases in light of the purpose of Congress to limit coverage short of the exercise by it of its full power under the Commerce Clause.

While attempted formulas of the relationship to production required for coverage cannot furnish automatic or spontaneous answers to specific problems of application as they arise in their protean diversity, general principles of the Act's scope afford direction of inquiry by defining the broad bounds within which decision must move. In *Kirschbaum Co.* v. *Walling, supra,* we found

that limits on coverage cannot be understood merely in terms of the social purposes of the Act, in light of which any limitations must appear inconsistent. For the Act also manifests the competing concern of Congress to avoid undue displacement of state regulation of activities of a dominantly local character. Accommodation of these interests was sought by the device of confinement of coverage to employment in activities of traditionally national concern. The focus of coverage became "commerce," not in the broadest constitutional sense, but in the limited sense of § 3 (b) of the statute: "trade, commerce, transportation, transmission, or communication among the several States . . . ." Employment "in" such activities is least affected by local interests. A step removed from employment "in commerce" is employment "in" production which is "for" commerce. Under this clause we have sustained coverage whether the product is to be consumed primarily by commerce in the statutory sense, by its "facilities and instrumentalities," see *Alstate Construction Co.* v. *Durkin,* 345 U. S. 13, or, as in the case of the products of the industrial consumers of water here, to move in it. Furthest removed from "commerce" is employment not "in" production "for" commerce but in an activity which is only "related" to such production. In applying this provision, we have necessarily borne in mind that it is furthest removed in the scheme of the statute from the hub of the national interest in "commerce" upon which a limited displacement of state power is predicated.

The amendment of § 3 (j) in 1949 did not alter the basic statutory scheme of coverage, but did reinforce the requirement that in applying the last clause of the section its position at the periphery of coverage be taken into account as a relevant factor in the determination. In revising coverage Congress turned only to the last clause of the section, which it evidently continued to regard as

marking the outer limits of applicability. The amendment substantially adopts the gloss of *Kirschbaum* to indicate the scope of coverage of activities only "related" to production. But examination of its history discloses that in adopting that gloss the purpose of Congress was not simply to approve everything done here and in the lower courts in what purported to be specific applications of that inevitably elusive formulation. While the approach of *Kirschbaum* was confirmed, the change manifests the view of Congress that on occasion courts, including this Court, had found activities to be covered, which the law-defining body deemed too remote from commerce or too incidental to it.

The House, overriding the contrary action of its Labor Committee which had left § 3 (j) unchanged, see H. R. 5856, as reported, and H. R. Rep. No. 267, 81st Cong., 1st Sess., 1949, adopted an amendment proposed by Committee member Lucas from the floor (95 Cong. Rec. 11000), which did amend § 3 (j). Representative Lucas made it plain that it was his purpose to constrict coverage. 95 Cong. Rec. 11001. As passed by the House, § 3 (j) was identical with the present Act except that for "directly essential" the House version used "indispensable."

The Senate substituted its own bill, S. 653, for the House draft, and its version left § 3 (j) unchanged. The resulting conference adopted the House bill insofar as it amended § 3 (j), with only the change already noted.

While the reports presented to the House and Senate by their respective conferees manifest some disagreement as to degree,[3] it is apparent that some restraint on coverage was intended by both. In the House, for example, *Kirschbaum* was approved and our decision in *Martino* v. *Michigan Window Cleaning Co.,* 327 U. S. 173, was dis-

---

[3] The views of a minority of the Senate conferees emphasize the apparent inconsistencies between the reports delivered to the House and Senate. 95 Cong. Rec. 14880.

approved (H. R. Conf. Rep. No. 1453, 81st Cong., 1st Sess., p. 15); while the Senate conferees, with different emphasis, noted only that the standard applied in "most" of our decisions was adopted.  95 Cong. Rec. 14874.

Both reports use as illustrations of coverage which remains unchanged by the amendment, employment in utilities supplying water to the producers of goods for commerce.  H. R. Conf. Rep. No. 1453, p. 14; 95 Cong. Rec. 14875.  But no illustration in either statement deals with construction of a dam designed solely for use as an impounding facility for a local water distribution system. The House Report does expressly state that the case of *Schroeder Co.* v. *Clifton,* 153 F. 2d 385 (C. A. 10th Cir.), is an instance of an activity not within the amended Act. But the activity there involved was one in support of construction of a dam; it was not the construction of the dam itself.  Thus, even were we to accept the illustrations in the House Report as authoritative, we would not be relieved of the duty of deciding where between these boundaries of approval and disapproval the present facts lie.  To do so requires that we once again apply the formulation set down in *Kirschbaum,* which, in light of the 1949 amendment, we must do with renewed awareness of the purpose of Congress to avoid intrusion into withdrawn local activities.

To establish coverage the Secretary relies upon *Farmers Reservoir & Irrigation Co.* v. *McComb,* 337 U. S. 755, which, he asserts, establishes that employees are covered who are engaged not merely in operation of, but in maintenance and repair of, the facilities of a company distributing water for consumption by producers for commerce.[4]  He urges that once it is recognized—as the court

---

[4] The Secretary. similarly relies on the approval in general terms of such coverage in the reports of the House and Senate conferees. H. R. Conf. Rep. No. 1453, 81st Cong., 1st Sess., p. 14; 95 Cong. Rec. 14875.

below failed to do—that construction work is not excluded from the Act's coverage, this concededly essential expansion of facilities is not distinguishable from maintenance and repair in any characteristic made relevant by the standard of "closely related" and "directly essential" to production. We do not agree.

Assuming *arguendo* that maintenance and repair of the completed dam would be covered employment, it does not follow that construction of the dam therefore is. The activities are undoubtedly equally "directly essential" to the producers of goods who depend upon the water supply; but they are not equally remote from production or from the "commerce" for which production is intended. The distinction between maintenance and repair on the one hand, and replacement or new construction on the other, may often be difficult to delineate but is a practical distinction to which law must not be indifferent. Its relevance here, where our purpose must be to isolate primarily local activities from the flow of commerce to which they invariably relate, lies in the close relation of maintenance and repair to operation, as opposed to replacement or new construction which is a separate undertaking necessarily prior to operation and therefore more remote from the end result of the process. As we held in *Vollmer,* that an activity is rightly called construction and is therefore distinct from operation, does not *per se* remove it from coverage. Construction may be sufficiently "closely related" to production to place it in that proximity to "commerce" which the Act demands as a predicate to coverage. Here, however, neither a facility of "commerce" nor a facility of "production" is under construction. Operation of the completed dam will merely support production facilities; and construction of the dam is yet another step more remote.

The Secretary relies upon *Mitchell* v. *Lublin, McGaughy & Associates,* 358 U. S. 207, and *Mitchell* v.

320

*Vollmer & Co., supra,* to establish that this construction is closely enough related to "production of goods for commerce" to be within the coverage of the Act. In each of those cases a construction activity was found "directly and vitally related" to "commerce" and therefore "in commerce," and what we have already said demonstrates that they are not useful guides here. As *Lublin, supra,* manifests, an activity sufficiently "directly related" to commerce to be "in" it is, at most, no further removed from "commerce" than is the employment "in production" itself which the Act expressly covers. Compare *Mitchell* v. *Lublin, McGaughy & Associates, supra,* with *Alstate Construction Co.* v. *Durkin,* 345 U. S. 13. For this reason, although the Act has never contained even a general definition of the relationship of an activity to commerce necessary to justify its inclusion, such a relationship has been extrapolated by the courts in conformity with the statutory scheme, so as to displace state regulation "throughout the farthest reaches of the channels of interstate commerce." *Walling* v. *Jacksonville Paper Co.,* 317 U. S. 564, 567. No independent vitality attaches to conclusory phrases such as "directly" or "vitally related." What is finally controlling in each case is the relationship of the employment to "commerce," in the sense of the statute, and it needs no argument that as to that relationship this case is significantly different from *Lublin* or *Vollmer.*

Moreover, though construction and operation of this dam are equally "directly essential" to the producers who require the water impounded and distributed, neither the construction nor the operation of the dam is designed for their use. Water is supplied by the District to a miscellany of users throughout its geographical area, and somewhat less than half of the consumption is by producers. These facilities, and their construction, are thus to be differentiated from the irrigation system in the

*Farmers Reservoir* case, which was dedicated exclusively to supply water to farmers producing for commerce.

These are no doubt matters of the nicest degree. They are inevitably so in the scheme and mode of enforcement of this statute. Bearing in mind the cautionary revision in 1949, and that the focal center of coverage is "commerce," the combination of the remoteness of this construction from production, and the absence of a dedication of the completed facilities either exclusively or primarily to production, persuades us that the activity is not "closely related" or "directly essential" to production for commerce."

The Secretary alternatively urges that because some of the water supplied by the District is consumed by facilities and instrumentalities of commerce, the water should be regarded as "goods" produced "for commerce" and the construction of the dam should be found sufficiently related to such production to be within the Act's coverage. He relies on *Alstate Construction Co.* v. *Durkin, supra,* and compares the water here to the construction materials there produced primarily for use in road construction. It is a sufficient answer to this contention that the record is devoid of evidence of a purposeful and substantial dedication of otherwise local production to consumption by "commerce" which was the basis of our decision in *Alstate.* Indeed, it appears that the water supplied to the facilities and instrumentalities of commerce is but an insignificant portion of the total.

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE BRENNAN concur, dissenting.

The opinion of the Court is more consistent with the dissent in *Mitchell* v. *Vollmer & Co.,* 349 U. S. 427, in which my Brother FRANKFURTER joined, than it is with

322

the Court's opinion in that case. The liberal construction given the Act from *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, to *Alstate Construction Co.* v. *Durkin,* 345 U. S. 13, and down to and including the *Vollmer* case is now forsaken. Yet this seems to me to be a singularly inappropriate occasion to change the direction of the law in a *mere matter of statutory construction.*

The report of the Senate Conferees (95 Cong. Rec. 14874–14875) which ushered § 3 (j) into the law in its present form[1] said:

> "The work of employees of employers who produce or supply goods or facilities for customers engaged within the same State in the production of other goods for interstate commerce may also be covered as closely related and directly essential to such production. This would be true, for example, of employees engaged in the following activities:
>
> .        .        .        .        .
>
> "2. Producing and supplying fuel, power, water, or other goods for customers using such goods in the production of different goods for interstate commerce. *Reynolds v. Salt River Valley Water Users Asso.* (143 F. (2d) 863 (C. A. 9)); *Phillips v. Meeker Coop. Light and Power Asso.* (158 F. (2d) 698 (C. A. 8)); *Lewis* v. *Florida Light and Power Co.* (154 F. (2d) 751 (C. A. 5)); *West Kentucky Coal Co.* v. *Walling* (153 F. (2d) 152 (C. A. 6))."

---

[1] Section 3 (j) provides:

" 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."

The dam here under construction was to furnish the City of Corpus Christi with a water supply—a city water system that services railroads, truck companies, airlines, other instrumentalities of interstate commerce and various producers of goods for commerce. It is conceded that the major industries in this area produce goods for commerce and use a substantial amount of water in that connection. Indeed, 40% to 50% of all water furnished by the city is used industrially.

*Reynolds* v. *Salt River Valley Water Users Assn.*, 143 F. 2d 863 (C. A. 9th Cir.), held that repair and maintenance employees of canals and dams of an irrigation company supplying water for growers of crops intended for shipment in interstate commerce were engaged in an occupation necessary for the production of goods for commerce.

*West Kentucky Coal Co.* v. *Walling*, 153 F. 2d 582 (C. A. 6th Cir.), held that men producing coal sold to factories producing goods for commerce were covered by the Act.

*Meeker Cooperative Light & Power Assn.* v. *Phillips*, 158 F. 2d 698 (C. A. 8th Cir.), held that employees of a power cooperative distributing electricity to companies that produced goods for commerce were covered by the Act.

These three decisions, as noted, were approved by the Senate report defining the scope of § 3 (j). Certainly then, employees maintaining this new dam would be covered by the Act, as our own decision in *Farmers Irrigation Co.* v. *McComb*, 337 U. S. 755, indicates.

How then, if these precedents are to be followed, can employees who built the dam be out of reach of the Act?

We held in *Mitchell* v. *Vollmer & Co., supra,* that construction of a lock to be used in commerce was work

"in commerce." "The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity." P. 429. There is no more remoteness here than there. It is difficult to understand why a stringent test of remoteness is used in determining whether construction work is related to "production of goods for commerce" when a liberal test was applied in the *Vollmer* case in holding that such work was "in commerce." See *Armour & Co.* v. *Wantock,* 323 U. S. 126, 131.

Prior to the 1949 amendments the standard in § 3 (j) was whether the work was in any "process or occupation necessary" for the production of goods for commerce. The present standard, so far as material here, is whether the work is "in any closely related process or occupation directly essential to the production" of goods for commerce.[2] The Senate report said that employees "repairing, maintaining, improving or enlarging . . . facilities of producers of goods" were covered. 95 Cong. Rec. 14875. This group, the report stated, were included because they were "performing tasks necessary to effective productive operations of the producer." 95 Cong. Rec. 14874.

Most of the decisions cited in the report which are descriptive of this category of employees were cases where the employees were working on existing structures or appliances used by producers of goods for commerce,[3] whether or not those facilities were owned by the producers. Such is the case of *Borden Co.* v. *Borella,* 325 U. S. 679. But one of the cases cited by the report as

---

[2] See note 1, *supra.*

[3] And see *Roland Electrical Co.* v. *Walling,* 326 U. S. 657, also cited with approval in the report. 95 Cong. Rec. 14875.

also descriptive of this group of employees was *Walling* v. *McCrady Construction Co.,* 156 F. 2d 932 (C. A. 3d Cir.), which brought within the Act's coverage workers building roads and bridges to be used to transport goods in process of production for interstate commerce.  These facilities, like the one in the present case, were not owned by the producers, nor were some of them yet in existence.  But when completed they would serve as facilities for those who were producing goods for commerce.  That case clearly suggests that the Congress in redefining the scope of § 3 (j) was following the broad contours of the coverage which had been delineated by the *construction* cases, as well as by the *maintenance* cases.

It seems as if there could be no doubt that the present case is brought squarely within that category, for this project was not the construction of a wholly new water system but an improvement of an existing water system.  Moreover, the water system being improved would seem to be as much a facility of those producing goods for commerce as was the highway in the *McCrady* case.  Moreover, in *Alstate Construction Co.* v. *Durkin, supra,* a company, making products sold intrastate but used to improve the facilities of those producing goods for commerce, was held to be employing workers covered by the Act.  The work in improving the present facility used by producers of goods for commerce is at least as close to the process of production as the labor of the men in the *Alstate* case.

So it is that I believe today's decision changes the symmetry of the judicial rulings under the Act, narrows its scope, and impairs its effectiveness.  Today's ruling is a departure from the accepted construction.  By this retreat I fear we invite hostile constructions that will undermine the broad base which Congress gave the Act. If there is to be a change in the direction of the law or an

alteration in its emphasis, it should be done by Congress which is far better suited than we to mark the farthest areas which the liberal policies of the Act were designed to cover. I regret that today we give up territory that Congress has fairly claimed, that we take a backward step from the measures Congress designed to protect the lowest paid and weakest group of wage earners in the Nation.