**UNITED STATES of America,**
**Plaintiff**

v.

**UNITED WRECKING CORPORATION**
**and**
**Edward A. Skyanier, Defendants.**

**Cr. No. 20441.**

United States District Court
E. D. Pennsylvania.
Aug. 16, 1961.

Walter E. Alessandroni, U. S. Atty., Philadelphia, Pa., Graeme Murdoch, Asst. U. S. Atty., Philadelphia, Pa., Ernest N. Votaw, Regional Atty., Leo L. Holstein, Deputy Regional Atty., U. S. Dept. of Labor, Chambersburg, Pa., for plaintiff.

Martin Heller and Marvin J. Levin, of Freedman, Landy & Lorry, Philadelphia, Pa., for defendants.

LAYTON, District Judge.

This is a criminal action brought under Section 215 of the Fair Labor Standards Act of 1938, as amended. 29 U.S. C.A. §§ 201–219. The evidence presents questions concerning coverage of the Act and the burden of proof to be borne by the government in a criminal proceeding such as this. Plaintiff has charged defendants with violations of the Act in four counts:

Count I—that defendants wilfully and unlawfully paid a night watchman named Samuel Wright less than the minimum wage of one dollar an hour during the period beginning January 8, 1958, and ending December 27, 1958.

Count II—that defendants wilfully and unlawfully failed to pay time and a half

overtime wages to eight named employees during the period January 1, 1958, and February 25, 1959.

Count III—that defendants wilfully and unlawfully made false records of the hours worked by seven named employees during the period January 1, 1958, and February 25, 1959.

Count IV—that defendants wilfully and unlawfully failed to keep and preserve any record showing the hours worked by Samuel Wright, the night watchman, during the period beginning January 8, 1958, and ending December 27, 1958.

Defendants plead not guilty to all parts of the information which pertain to Samuel Wright, the night watchman. (Counts I, II & IV). Defendants also plead not guilty to parts of Count II pertaining to another employee named Horace Spikes. As to all other employees named in Counts II and III, defendants plead nolo contendere, thus admitting the allegations. Therefore, only Spikes and Wright need be considered here. Defendants concede that there was wilful failure to keep records of hours worked by Wright as alleged in Count IV. Defendants' sole contention with respect to Count IV is that Wright does not fall within the scope of the Fair Labor Standards Act. Defendants deny failure to pay a minimum wage or overtime to Wright as alleged in Counts I and II. It was stipulated that the other employee, Spikes, is covered by the Act. But defendants say the government has failed to prove the violations alleged, thus raising only issues of fact, which must now be determined by the court, since defendants waived a jury.

The facts are as follows. United Wrecking Corporation is a Pennsylvania corporation whose business is demolishing buildings and selling the scrap. In December of 1957, defendant, Edward A. Skyanier, president of United, entered into a contract with another Pennsylvania corporation to demolish buildings on a large area near Philadelphia known as the "Brill Site." Under the contract, United purchased certain buildings on the site and agreed to demolish and remove all the materials comprising the buildings, leaving the site clean of debris. Paragraph 5 of this contract provided that United "shall * * * maintain security for the protection of the aforesaid buildings and property upon the site and shall engage night watchmen for such purpose and purposes." Partly pursuant to this contract provision and partly to retain favorable public liability insurance rates, defendants employed Wright as night watchman in the winter of 1958. He worked continuously from January 1, 1958, to December 27, 1958. Spikes was employed by United at the Brill Site as a burner and as a truck driver during the period January 1, 1958, and February 25, 1959.

## I.

In the words of Maurice Skyanier, defendant's son, Wright's duties were to "protect anyone or anything that would have to be protected" on the Brill Site. Wright walked around the plant and checked tool boxes and equipment to make certain none were taken. He guarded piles of scrap on the site, which included scrap iron, copper, wires and lumber. There was also a quantity of used brick in the area patrolled by Wright. Occasionally Wright would put out fires and would call the fire department if a blaze got out of control. At all times he was supposed to keep pedestrians and trespassers away from the property, especially school children during the late afternoon and early evening. During weekdays, Wright began work at 4:30 in the afternoon when the wrecking crew left for the day, and watched until 8:00 the following morning, when the workmen returned. Wright also watched on week ends whenever there was a holiday or for some other reason none of the wrecking crew worked. While on duty Wright stayed at a shack located on the site premises where he cooked, took naps, and kept warm during the course of his duty. Wright was paid $30 a week by either defendant, Edward A.

Skyanier, or his son, Maurice Skyanier, although he occasionally received $2 extra for work on Saturdays and $5 extra for work on Sundays. There is evidence from which it might be inferred that the scrap iron, lumber, wire and copper guarded by Wright was eventually sold to various dealers. However, careful search of the record reveals no evidence showing that any such purchasers came from a state other than Pennsylvania or that the scrap metals and lumber guarded by Wright found its way into interstate commerce. On the other hand, used brick in substantial quantities were from time to time purchased by an out-of-state buyer and hauled to a neighboring state.

In addition to watching, Wright utilized some of his spare time cleaning used brick that lay about the site. For this activity he was paid $6 per thousand brick cleaned. Over the period January 1958 to December 1958, Wright cleaned approximately 6,000 brick for which he received about $36. The only evidence in the record that used brick on the Brill Site found its way into interstate commerce is the testimony of Charles J. Della Vecchia, President of the Jersey Dunbrik Manufacturing Company, a firm having its principal place of business in Osage, N. J. Della Vecchia bought used brick located on the Brill Site from defendants in periodic transactions from April to November 1958. Analysis of 42 checks drawn by Jersey Dunbrik Manufacturing Co. to the order of United in payment for used brick (Government Exhibit No. 7) shows that 152,600 used brick were purchased by Della Vecchia for a total of $2183.10 over the eight month period. If each check is viewed as a separate transaction, there were 42 trips from New Jersey to the Brill Site in Pennsylvania where Della Vecchia (or his employees) loaded trucks with used brick. For the eight months, there was an average of five trips made, and 19,075 brick worth $272.89 purchased each month. However, Della Vecchia testified that he had never hired a brick cleaner at the Brill Site, and never paid separate amounts to have brick cleaned there. There is no evidence that he knew Wright or purchased brick that had been cleaned by Wright. Wright was not the only brick cleaner. During the course of the year in question there were approximately ten brick cleaners at the Brill Site. There were also approximately four or five other jobbers such as Della Vecchia who bought used brick. It is significant that the record does not show whether these other jobbers were local or from another state. The court recognizes that plaintiff cannot be required to trace each individual brick cleaned by Wright into the hands of an interstate purchaser. Southern Advance Bag & Paper Co. v. United States, 5 Cir., 1943, 133 F.2d 449. But in a criminal proceeding the government must prove its allegations beyond a reasonable doubt. This the government has not done. The 6000 brick cleaned by Wright for an entire year represents only 3.9% of the 152,600 brick purchased by the only interstate purchaser, Della Vecchia, in eight months. There is a reasonable doubt that Della Vecchia purchased any of the brick cleaned by Wright. It is obvious that 96.1% of the brick purchased by Della Vecchia was cleaned by the other ten cleaners. It seems quite possible that all of it was cleaned by them.

The evidence amply justifies the following findings relating to alleged violations of the Act:

(1) Wright was employed by defendants for more than 40 hours a week and was wilfully paid no overtime wages during the period January 8, 1958, to December 27, 1958.

(2) Wright received only $30 a week wages during this period, which is less than the statutory minimum wage of one dollar an hour. The failure of defendants to pay Wright the minimum wage was wilful.

The evidence also justifies these findings relating to coverage of Wright by the Act:

(1) Wright was employed as a watchman to guard against fire and trespassers, and to prevent damage to or stealing of anything valuable on the site, including tools, machinery, scrap metal, copper, wiring, lumber, brick, etc.

(2) The government failed to prove beyond a reasonable doubt that any of the scrap metal, copper, wiring, or lumber watched by Wright found its way into interstate commerce.

(3) The government failed to prove beyond a reasonable doubt that any of the brick cleaned by Wright for which he was paid were sold into interstate commerce. Moreover, the amount of brick cleaned, 6,000, and the total amount Wright received for labor, $36 for the entire year, was so negligible as to merit little or no consideration.

(4) The government has proved beyond a reasonable doubt that not only was Wright employed, among other things, to watch or guard brick, but that a substantial quantity of brick worth $2,183.10 was sold in interstate commerce.

(5) The contract between defendant corporation and the owner of the Brill Site required a watchman, and the presence of a watchman helped lower defendants' insurance rates.

■ In the light of the foregoing findings of fact, we must now determine whether Wright is covered by the Act. The introductory clause of Section 206 (a) (minimum wage provision) and Section 207(a) (overtime pay) (29 U.S. C.A. §§ 206 and 207) limits coverage to "employees who [are] engaged in commerce or in the production of goods for commerce." Thus, plaintiff must prove four things in order to establish that Wright is subject to the Act: (1) that Wright was an "employee"; (2) that Wright was either engaged *"in"* commerce or in *"production"* of goods for commerce; (3) that there were *"goods"*; and (4) that there was *"commerce"*—all within the meaning of the Act. It was stipulated that Wright was an "employee" of defendants and it is uncontest-

ed that the scrap and used brick are "goods" within the meaning of 29 U.S. C.A. § 203(i). See Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883, 886; Sams v. Beckworth, 5 Cir., 1958, 261 F.2d 889, 891. We need not determine whether Wright was engaged "in" commerce or was a "producer of goods for commerce" in his capacity as a brick cleaner because there was insufficient proof that the brick he cleaned entered into "commerce", as defined in 29 U.S.C.A. § 203 (b) ("trade [or] transportation * * * between any state and any place outside thereof").

However, Wright in his capacity as a watchman may have been in "production of goods for commerce." Here it was adequately established that the brick Wright watched did enter "commerce."

■■ In a 1949 amendment to the Act, Congress attempted to make clearer what employees are covered by the phrase "production of goods." 29 U.S. C.A. § 203(j) states:

"* * * an employee shall be deemed to have been engaged in the production of goods if such employee was employed * * * in any *closely related* process or occupation *directly essential* to the production thereof * * *." (Emphasis supplied).

The scope of this definition in Section 203(j) has been a source of much litigation. Congress intended it to mark the outer limit of coverage under the Act. Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 316–317, 80 S.Ct. 739, 4 L.Ed.2d 753. However, it is apparent from legislative history that the scope of the Act is not coextensive with the limits of the constitutional power of Congress to regulate commerce under the commerce clause. See the detailed analysis of legislative history in Kirschbaum v. Walling, 1942, 316 U.S. 517, 522–525, 62 S.Ct. 1116, 86 L.Ed. 1638, Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 316–318, 80 S.Ct. 739, 4 L.Ed.2d 753, Mitchell v. Dooley Bros., Inc., 1 Cir., 1960, 286 F.2d 40, 42–44. Congress has

impliedly left a domain for regulation by the states. "Congress may choose, as it has chosen frequently in the past, to regulate only a part of what it constitutionally can regulate, leaving to the States activities which, if isolated, are only local." Kirschbaum v. Walling, 1942, 316 U.S. 517, 521, 62 S.Ct. 1116, 1119, 86 L.Ed. 1638. The problem, then, is to draw a line between those activities which Congress left to the states and those which were intended to come within the Act.

To satisfy Section 203(j), as amended in 1949, Wright's activities as a watchman must not only be "directly essential" but also "closely related" to the production of used brick (see the italicized portion of Section 203(j) quoted supra). Defendants urge that these standards in the 1949 amendment were intended to restrict the coverage of watchmen under the Act. To support this contention, defendants have quoted extensively in their brief from the recent Supreme Court decision, Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753. This case, however, damages more than it helps defendants. Zachry concerned coverage of construction workers (not watchmen) on a dam that impounded water for a local water distribution system in Texas. Some of the water eventually was utilized by industries producing goods for commerce. The Court held that these construction workers were outside the scope of Section 203(j) because their activities were not "closely related" to the production of goods. But in reaching this result, the Court made a careful distinction between these construction workers, who were not covered, and maintenance workers, such as watchmen, whom it assumed, arguendo, would have been covered. 362 U.S. at pages 319–321, 80 S.Ct. at pages 745–746. It is true that the 1949 amendment to Section 203(j) narrowed coverage of the Act. It is not true, as defendants urge, that coverage of watchmen and other maintenance employees was necessarily affected. The assumption of Zachry is

that maintenance workers such as watchmen would have been subject to the Act under the facts of that case. Defendants' contention is further weakened by the fact that the leading case dealing with coverage of maintenance workers, Kirschbaum v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, was expressly approved by Congress in 1949. Report of the Majority of Senate Conferees, 95 Cong.Rec. 14875 (1949); H.R. Rep. No. 1453, 81st Cong. 1st Sess. 14 (1949). See also Mitchell v. Dooley Bros., Inc., 1 Cir., 1960, 286 F.2d 40, 42.

■ The court here finds that Wright's activities were "directly essential" to the production of used brick. His presence on the site was required in the contract between United Wrecking Corp. and the owner of the Brill Site. Wright safeguarded the property from fires which might have interfered with production. In addition, Wright's presence helped reduce defendants' insurance rates. This last fact alone was evidence that his activity was "directly essential" within the meaning of Section 203(j). See Walton v. Southern Package Corp., 1944, 320 U.S. 540, 542, 64 S.Ct. 320, 88 L.Ed. 298; Armour & Co. v. Wantock, 1944, 323 U.S. 126, 131, 65 S.Ct. 165, 89 L.Ed. 118.

The court also finds that Wright's activity as a watchman was "closely related" to the production of used brick and is well within the rule of Kirschbaum v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638 (watchmen in the building where dresses were manufactured for commerce held covered by the Act). See also Borden Co. v. Borella, 1945, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865 (watchmen in central administrative office building of a large corporation held covered even though no goods actually manufactured in the building). Compare 10 East 40th St. Bldg. v. Callus, 1945, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806 (activities of watchmen in a general office building where no actual manufacturing took place, and with numerous and constantly changing tenants, not covered). For a useful analysis of

the meaning of "closely related", see Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 319–321, 80 S.Ct. 739, 4 L.Ed. 2d 753. Wright's activities as a watchman took place where the used brick were physically produced, as in Kirschbaum. The brick were transported directly from the Brill Site by Della Vecchia's trucks into a neighboring state. There were no intermediate processes or places separating the activity of the watchman and the physical production of the goods which entered commerce. The activities of the watchman, Wright, were thus "closely related" to the production of goods and fall within Section 203(j). From this it follows that Wright is covered by the Act.

This conclusion is entirely consistent with the holding in Sams v. Beckworth, D.C.E.D.Tex., 168 F.Supp. 686, affirmed 5 Cir., 1958, 261 F.2d 889, another case relied on by defendant. There a watchman in a junkyard was held not covered by the Act. But in Sams, the scrap guarded by the watchman was first sold to local junk dealers who in turn sold a substantial amount of scrap to certain steel foundries, also located in the same state. The foundries processed the scrap into steel products and only thereafter did any of the scrap enter into the channels of interstate commerce. 168 F. Supp. at pages 687–688. The court held, and correctly so, that the activities of the watchman were not an occupation "closely related" to the production of goods for commerce. There were too many steps intervening between the watching activity in the junkyard and the production in the foundries of the steel products that entered commerce. Comparable distinguishing features are present in another case relied upon by defendant, Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883.

Since Wright, in his capacity as a watchman, is covered by the Act, and since defendants have wilfully failed to pay him the minimum wage required by Section 206 and overtime required by Section 207, it follows that defendants are guilty under Counts I and II as charged. Defendants have admitted wilful failure to keep any records of employment as required by Section 211(c) of the Act. Thus, they are guilty as charged under Count IV, as well.

## II.

We now return to the other employee at issue: Horace Spikes. Spikes was employed by the United Wrecking Corporation at the Brill Site for 28 to 30 weeks between June and December, 1958. He had first been hired at the site as a "burner." A "burner" uses an acetylene torch to cut scrap steel into pieces so that it can be handled and loaded onto trucks. For this work Spikes was paid $1.50 an hour, but after six weeks he was transferred to work as a truck driver. At the same time, he received a 15-cent raise to $1.65 an hour. Thereafter, he drove a truck whenever he wasn't "burning." Spikes' normal working hours were from 8:00 in the morning until 5:30 or 6:00, sometimes 7:00, in the evening. Spikes also worked on several weeks ends. He worked eight to ten Sundays and an unknown number of Saturdays—but at any rate, more Saturdays than Sundays. When Spikes worked on a Saturday, he received his usual weekly wage of $1.65 an hour. On Sundays, he received $2. He received his pay at all times in an envelope which he picked up at the office of the United Wrecking Corporation.

Since it was stipulated that Spikes is covered by the Act, we need only determine whether the facts, as found above, show defendants are guilty of wilful failure to pay Spikes overtime wages. The court finds defendants guilty under Count II as to Spikes because the facts show he worked more than 40 hours a week and defendants failed to pay him time and a half overtime as required by 29 U.S.C.A. § 207. On review of the entire record, the court concludes that this failure on the part of defendants was deliberate and wilful.