325 F.2d 78
 W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellant,
v.
H. D. McDANIEL and D. H. "Dee" McDaniel, Individually, and as Co-Partners, Doing Business as McDaniel Brothers Construction Company, Appellees.
 No. 17269.
 United States Court of Appeals Eighth Circuit.
 December 4, 1963.
 
 Beate Bloch, Atty., U. S. Dept. of Labor, Washington, D. C., made oral argument for the appellant and Charles Donahue, Solicitor of Labor, Washington, D. C., Bessie Margolin, Assoc. Solicitor, Washington, D. C., Earl Street, Regional Atty., Dallas, Tex., were with her on the brief.
 James E. McDaniel and Charles M. Monney, of McDaniel, Ward & Mooney, Jonesboro, Ark., were counsel for the appellees. No oral argument was made and no brief filed on behalf of appellees.
 Before VOGEL, MATTHES and MEHAFFY, Circuit Judges.
 VOGEL, Circuit Judge.
 
 
 1
 The Secretary of Labor commenced this action under § 17 of the Fair Labor Standards Act, 29 U.S.C.A. §§ 201 et seq., to enjoin the defendants from violating the Act's overtime and record-keeping provisions with respect to their employees engaged in the construction of a manufacturing plant at Jonesboro, Arkansas, such plant to be used by the Crane Company. Non-compliance with the provisions of the Act was conceded. The District Court, however, concluded that the employees were not subject to the Act and accordingly dismissed the action. 209 F.Supp. 399.
 
 
 2
 The facts are not in dispute. The defendants are general contractors, their business including the construction of factories and other manufacturing facilities. On February 10, 1960, they entered into a contract with the Jonesboro Industrial Development Corporation (JI DC) for the construction of a new factory building on land owned by the City of Jonesboro, Arkansas (City) for use by the Crane Company in the manufacturing of plumbing brass. JIDC is an agency of City. It engaged the defendants to construct a new plant on the basis of a "Facilities Construction Contract" whereby City undertook to construct such a factory in accordance with plans and specifications prepared by Crane, and Crane undertook to enter into a long-term lease thereof — 23 years with renewal options.
 
 
 3
 Crane and its subsidiaries manufacture plumbing, heating and air conditioning equipment as well as other products at numerous locations throughout the country and distribute their products both nationally and internationally. Before the construction of the Jonesboro factory, Crane manufactured plumbing brass at its own plant in Chicago, Illinois, and also at the plant of a wholly-owned subsidiary, Repcal Brass Manufacturing Company, in Los Angeles, California. Brass produced by these plants was shipped to wholesalers and supply houses in every state of the Union and Canada and also to other manufacturing plants operated by Crane and its subsidiaries in Trenton, New Jersey, Chattanooga, Tennessee, and Colton, California, for use in the manufacture of plumbing fixtures.
 
 
 4
 Crane desired a new mid-continent location to replace its Chicago plant in the manufacture of plumbing brass and to which it planned to divert a portion of the production carried on by its subsidiary in Los Angeles. JIDC, which was organized for the purpose of attracting industry or facilitating its location in Jonesboro, acted as the "alter ego" of City in handling negotiations concerning the construction of the new plant with Crane and with the defendants herein.
 
 
 5
 On January 28, 1960, Crane entered into the "Facilities Construction Contract" and a "Lease Agreement" with JIDC, the City of Jonesboro, the Jonesboro Airport Commission, and the City Water and Light Plant. These agreements followed several weeks of negotiations, during which Crane submitted to the City its own plans for the type of building it wanted. Such plans included numerous special features geared to the particular requirements of brass manufacturing. The building was to be "put around the equipment" used in the production operations. The building was tailored especially to meet Crane's needs. Defendants' construction contract was negotiated entirely on the basis of Crane's plans and specifications. The defendants were aware of the fact that the building was planned for occupancy by Crane. Construction of the building would not have been undertaken at all had there been any question but that Crane would lease the building. Construction was financed through a bond issue which widely publicized Crane's intended use of the plant.
 
 
 6
 The construction contract was entered into on February 10, 1960, between the defendants and JIDC and subsequent to the facilities construction contract and lease agreement. Construction commenced in February 1960. In April or May of that year substantial changes in the original plans were necessitated by Crane's decision to close its Los Angeles plant entirely and transfer all of its production to the new Jonesboro plant. Substantial changes were necessitated in order to accommodate electric furnaces shipped from the California plant to be used in the new factory. These and other changes in the original plans were discussed by the Crane representatives with the defendants directly, either in person or by correspondence.
 
 
 7
 As the new building neared completion, key personnel of both Crane and its subsidiary, Repcal Brass of Los Angeles, were transferred to the new plant and machinery and equipment were moved to Jonesboro from Chicago and Los Angeles. Brass was shipped to the new Jonesboro plant from Los Angeles and component parts from Chicago. By the time of trial Crane was producing plumbing brass at Jonesboro and shipping it to Crane establishments located all over the United States.
 
 
 8
 The Act provides, insofar as it may be applicable herein, 29 U.S.C.A.:
 
 
 9
 "§ 206. Minimum wage
 
 
 10
 "(a) Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates —"
 
 
 11
 "§ 203. Definitions * * *
 
 
 12
 "(j) `Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State." (Emphasis supplied.)
 
 
 13
 The question is, of course, whether the employees of the defendant were "engaged in commerce or in the production of goods for commerce". If they were engaged in any "closely related process or occupation directly essential to the production" of goods for commerce, they would also be within the provisions of the Act. In other words, the occupation, to qualify, here must be closely related to and also directly essential to the production of goods for interstate commerce.
 
 
 14
 In holding that the Act was not applicable to the facts in this case and in dismissing the complaint, the District Court concluded:
 
 
 15
 "* * * I do not feel that employees who are constructing a manufacturing building are closely enough related to production to place it `in that proximity to "commerce" which the Act demands as a predicate to coverage.'"
 
 
 16
 While recognizing the present limitations of the so-called new construction rule, the District Court also said:
 
 
 17
 "* * * It is the opinion of this court that the new construction doctrine announced in the Vollmer case has been limited to repairs and extensions of existing industrial facilities, and the repairs, constructions, and reconstructions of interstate facilities."
 
 
 18
 We believe the lower court to have been in error in dismissing the action and that the employees of the defendants who were engaged in the construction of concededly a new factory, but which factory would replace existing facilities as part of a nation-wide production and distribution network in interstate commerce, were both "closely related" and "directly essential" to the production of goods for commerce within the meaning of the Act.
 
 
 19
 Summarized, the undisputed testimony here indicates:
 
 
 20
 1. The Crane Company was engaged in interstate commerce in all of the several states and internationally.
 
 
 21
 2. The factory building erected by the defendants was specifically constructed for the use of the Crane Company in the manufacturing of plumbing brass.
 
 
 22
 3. The Crane Company had entered into a lease agreeing to rent the new factory for a period of not less than 23 years.
 
 
 23
 4. The new factory was built in accordance with the plans and specifications of the Crane Company.
 
 
 24
 5. The new factory was built for the sole purpose of serving as a replacement or relocation of existing facilities of the Crane Company then located in Chicago and Los Angeles.
 
 
 25
 6. The new factory building was made to accommodate equipment shipped from Crane's other plants which it was to replace.
 
 
 26
 7. Crane Company's factories in Chicago and Los Angeles which were to be replaced by the new plant at Jonesboro were engaged in producing goods for interstate commerce.
 
 
 27
 8. Key personnel of Crane from Chicago and Los Angeles as well as machinery and equipment were moved to the new factory in Jonesboro.
 
 
 28
 9. While all the initial negotiations were handled by JIDC, there was direct contact between defendants and Crane officials as the construction progressed.
 
 
 29
 10. The new factory would not have been built had there been any question but that Crane would lease it.
 
 
 30
 The Supreme Court in Mitchell v. C. W. Vollmer & Co., 1955, 349 U.S. 427, at page 429, 75 S.Ct. 860, at pages 861-862, 99 L.Ed. 1196, referred to by the District Court, supra, said:
 
 
 31
 "* * * The question whether an employee is engaged `in commerce' within the meaning of the present Act is determined by practical considerations, not by technical conceptions. See Walling v. Jacksonville Paper Co., 317 U.S. 564, 570 [63 S.Ct. 332, 87 L.Ed. 460]; Overstreet v. North Shore Corp., 318 U.S. 125, 128, 130 [63 S.Ct. 494, 87 L.Ed. 656]. The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity. See McLeod v. Threlkeld, 319 U.S. 491, 497 [63 S. Ct. 1248, 87 L.Ed. 1538]." (Emphasis supplied.)
 
 
 32
 In Vollmer, the court held that employees engaged in the construction of a lock and canal which was intended to form part of an interstate waterway and which was designed as an alternate route to an inadequate existing lock and canal were engaged in commerce within the meaning of the Act in that it was "part of the redesigning of an existing facility of interstate commerce".
 
 
 33
 Mitchell v. Lublin, McGaughy & Associates, 1959, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243, held that employees working intimately with plans and specifications prepared by the employer for the construction, repair, relocation and improvement of various interstate instrumentalities and facilities were "directly and vitally related to the functioning of these facilities because, without the preparation of plans for guidance, the construction could not be effected and the facilities could not function as planned." In so holding, the court said at page 213 of 358 U.S., at pages 264-265 of 79 S. Ct., 3 L.Ed.2d 243:
 
 
 34
 "* * * Whatever vitality the `new construction' doctrine retains after Mitchell v. [C. W.] Vollmer & Co., supra, and Southern Pacific Co. v. Gileo, 351 U.S. 493, 500 [76 S. Ct. 952, 100 L.Ed. 1357], it is not applicable here because, as the record shows, many projects involved the repair, extension, or relocation of existing facilities." (Emphasis supplied.)
 
 
 35
 Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753, is the Supreme Court's most recent construction of coverage under the Fair Labor Standards Act. There the court held that employees of a large construction contractor engaged in constructing a dam solely to increase the reservoir capacity of the local water system of a city and its vicinity, all within a single state, were not "engaged in commerce or in the production of goods for commerce" or in "any closely related process or occupation directly essential to the production thereof" within the meaning of § 3(j) and § 7(a) of the Act and therefore were not covered by the overtime requirements of the Act, even though a substantial part of the water was to be used by producers of goods for interstate commerce plus an insignificant part by interstate commerce instrumentalities. While holding no coverage in that case, the court made significant statements which we believe point definitely to coverage under the facts with which we are here concerned. The court there stated at pages 313 and 314 of 362 U.S., at pages 742-743 of 80 S.Ct., 4 L.Ed.2d 753:
 
 
 36
 "* * * whether construction work is covered depends upon all the circumstances of the relation of the particular activity to `commerce' in the statutory sense and setting, * * *." (Emphasis supplied.)
 
 
 37
 At page 316 of 362 U.S., at pages 742-743 of 80 S.Ct., 4 L.Ed.2d 753, Mr. Justice Frankfurter discussed the three classifications of coverage under the Act as follows:
 
 
 38
 "* * * [1.] The focus of coverage became `commerce,' not in the broadest constitutional sense, but in the limited sense of § 3(b) of the statute: `trade, commerce, transportation, transmission, or communication among the several States * * *.' Employment `in' such activities is least affected by local interests. [2.] A step removed from employment `in commerce' is employment `in' production which is `for' commerce. Under this clause we have sustained coverage whether the product is to be consumed primarily by commerce in the statutory sense, by its `facilities and instrumentalities,' see Alstate Construction Co. v. Durkin, 345 U.S. 13 [73 S.Ct. 565, 97 L.Ed. 745], or, as in the case of the products of the industrial consumers of water here, to move in it. [3.] Furthest removed from `commerce' is employment not `in' production `for' commerce but in an activity which is only `related' to such production." (Emphasis supplied.)
 
 
 39
 At page 319 of 362 U.S., at page 745 of 80 S.Ct., 4 L.Ed.2d 753:
 
 
 40
 "* * * As we held in Vollmer, that an activity is rightly called construction and is therefore distinct from operation, does not per se remove it from coverage. Construction may be sufficiently `closely related' to production to place it in that proximity to `commerce' which the Act demands as a predicate to coverage." (Emphasis supplied.)
 
 
 41
 At page 321 of 362 U.S., at page 746 of 80 S.Ct., 4 L.Ed.2d 753:
 
 
 42
 "* * * Bearing in mind the cautionary revision in 1949, and that the focal center of coverage is `commerce,' the combination of the remoteness of this construction from production, and the absence of a dedication of the completed facilities either exclusively or primarily to production, persuades us that the activity is not `closely related' or `directly essential' to production for commerce." (Emphasis supplied.)
 
 
 43
 In answer to the Secretary's contention that because some of the water was consumed by facilities and instrumentalities of commerce, it should be regarded as "goods" produced "for commerce", and the dam construction should be sufficiently related to such production to come within the Act's coverage, the court held at page 321 of 362 U.S., at page 746 of 80 S.Ct., 4 L.Ed.2d 753:
 
 
 44
 "* * * the record is devoid of evidence of a purposeful and substantial dedication of otherwise local production to consumption by `commerce' which was the basis of our decision in Alstate. Indeed, it appears that the water supplied to the facilities and instrumentalities of commerce is but an insignificant portion of the total."
 
 
 45
 Obviously, if there is coverage here the work of the employees must be in an activity which is closely related to and directly essential to production, being the third classification referred to in Zachry. Keeping in mind the teachings of the Supreme Court in Vollmer, Lublin and Zachry, we point out that the new factory here was "dedicated" primarily and exclusively to the production of goods by Crane for interstate commerce from the very inception of the plans and contracts. Additionally, the construction of the factory constituted no "isolated, local activity" such as referred to in Vollmer and there is no "remoteness of this construction from production" as in Zachry. The new factory here was built for the sole purpose of serving as a replacement or relocation of existing facilities of the Crane Company in Chicago and Los Angeles, each of which was engaged in interstate commerce. The work in which the employees here were engaged was more closely related and more directly essential to the production of goods for commerce than the employees in Lublin, supra, who merely prepared plans and specifications for the construction and relocation of interstate facilities and who were there held to be covered by the Act. Applying the Vollmer rule that coverage under the Act is to be "determined by practical considerations, not by technical conceptions" and that to come within the scope of the Act's coverage the work must be "so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity", we cannot conceive of any new construction more "closely related" and more "directly essential" to production of goods for commerce than the relocation-replacement construction of this factory, designed and dedicated to take the place of existing plants and which was to operate as an integral part of Crane's nation-wide business. We hold here that the defendant's employees were engaged in work which was both "closely related" to and "directly essential" to the production of goods for commerce. See Goldberg v. Five Boro Construction Corp., 1 Cir., 1961, 291 F.2d 371; Goldberg v. Barger Construction Co., W.D.N.C., 1962, 210 F.Supp. 752; and Goldberg v. Dakota Flooring Co., D.C.N.D., 1961, 201 F.Supp. 161.
 
 
 46
 This case is reversed and remanded with directions to enter the injunction as requested by the Secretary.